# CHARLESTON.

STATE *v.* PITT MORRIS AND TIP JOHNSON.

Submitted March 26, 1924.   Decided April 22, 1924.

1.   ROBBERY—*Evidence Held Insufficient to Sustain Conviction.*

Where the indictment charges the accused of robbing the
prosecuting witness of a revolver, being armed with a deadly
weapon, and the evidence and circumstances disclose that the
accused, a special constable on his way to execute criminal pro-
cess, accompanied by a companion for that purpose, upon reach-
ing the home of the latter, found the prosecuting witness there
with bottles of intoxicating liquor in his pocket and partially ex-
posed to view, and after a short colloquy took him from his
horse by force assisted by his companion, having in their
possession and ready for use their pistols; disarmed him of the
revolver mentioned in the indictment, and took from him
his liquor; and the pistol so taken is delivered, a day or so
after, to a justice of the peace by a prohibition officer who
happening on the scene of the alleged robbery assisted in
disarming the prosecuting witness and the confiscation of his
liquor; the essential element of the intent to steal, take and

carry away the revolver on the part of the accused at the time they came into possession of the revolver, is not clearly shown and the taking under such circumstances does not warrant a conviction of robbery. (p. 298).

2.  SAME—*Intent to Take Property Must Exist at Time of Robbery.*

To constitute the crime of robbery in this case the intent to steal, take and carry away the pistol must have existed in the minds of the accused at the time the prosecuting witness was disarmed; any subsequent appropriation or carrying away of the pistol, although illegal, does not make it robbery. (p. 298).

3.  CRIMINAL LAW—*Persistent Effort to Introduce Prejudicial Evidence Held Error, Although Objections Thereto Sustained and Jury Admonished to Disregard.*

The prosecution in the trial of such case commits error when it attacks the character of the accused as a law abiding citizen, (the same not being at issue), by a series of questions persistently propounded to him on cross examination asking if he has not been charged with, convicted of, and served sentence for various infractions of the law in no way pertinent to the issue, although objections to the questions and answers are sustained by the court and the jury cautioned not to consider them. The persistent effort to introduce improper and prejudicial evidence, in spite of the rulings by the court of its illegality, can only be for the purpose of prejudicing the jury, and is not wholly cured by instructions to disregard it. (p. 301).

Error to Circuit Court, Clay County.

Pitt Morris and Tip Johnson were convicted of robbery, and they bring error.

*Reversed; verdict set aside; new trial awarded.*

*A. M. Belcher* and *Roy K. Morris,* for plaintiffs in error.
*E. T. England,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

LIVELY, JUDGE:

The indictment charges that Pitt Morris, Tip Johnson, Grant Cochrane and O. D. Dillard, being armed with revolvers, feloniously did make an assault upon and put in

bodily fear one Cal Vance and "one check payable to the order of O. D. Dillard, given on the Bank of Gauley, Gauley Bridge, West Virginia, in the sum of seventy-five dollars and of the value of seventy-five dollars, and one revolver of the value of twenty dollars, the property of the said Cal Vance, from the person and against the will of the said Cal Vance, then and there, to-wit, on the day and year aforesaid, in the county and state aforesaid, feloniously and violently did steal, take and carry away," etc.

Defendants Morris and Johnson were tried together and found guilty as charged. Dillard was dead at the time of the trial; Cochrane does not appear to have been apprehended. Morris and Johnson obtained a writ of error.

The main ground relied on for reversal is that the verdict is contrary to the law and the evidence. A number of other questions incidentally arise, but they are all covered by this one assignment of error. (Some errors were committed in the course of the trial in allowing certain evidence to go to the jury, but no objection was made or exception taken; these will be pointed out in order to prevent error upon a new trial).

It appears from the testimony that defendant Morris, in January, 1921, was appointed a special constable by Justice C. E. Jarrett of Kanawha county, to execute a warrant for the arrest of Kester Auxier, charged with operating a moonshine still, and was by the justice in that case authorized to carry a revolver. He did not know just where Auxier lived, but it was somewhere on Rock Camp, and supposed by Morris to be in Kanawha county. Johnson lived in Clay county, near the Kanawha-Clay county line, but supposed by Morris to be in Kanawha County. According to arrangements made between them, Morris went up to Gauley Bridge on January 13th, changed cars there and went further on to Bend Tree, where he was met by Johnson, who was to go with him over to Johnson's house, evidently a considerable distance, but not stated in the evidence, and direct Morris from there where or how to find Auxier. They got over to Johnson's house around three o'clock in the afternoon. As they approached the house they saw two men who turned out to be Cal Vance and Russel Dorsey. In or about the house were O. D. Dillard, a state prohibition officer,

Grant Cochrane, Johnson's wife and thirteen year old daughter, and Johnson's father. The prosecuting witness, Cal Vance, testified that he lived at Vaughn, Nicholas county, and was a constable of that county; that on January 13, 1921, he was over near Johnson's house to obtain some information about the school house located there, for use in an approaching trial between the "auditor" and the board of education, probably of Pleasant District. How he met the two defendants or what took place when they met he does not say, but abruptly states: "They just pulled me off my horse back—pulled and jerked my check book out of my pocket—jerked my gun out from my holster and took that and punched me along with the guns until they got me in the house." Dorsey lived about five miles from Johnson and was on his way to serve process in a civil suit on one Auxier who lived in the neighborhood, and was accompanied by Vance for the purpose above stated. They had stopped at Johnson's house on the suggestion of Vance to inquire the way to Auxier's place of abode, and had been there several minutes before the arrival of Morris and Johnson. From the time of the arrival of the latter the evidence is in sharp conflict. Vance and Dorsey say that they were kept virtual prisoners in and about the Johnson house for two hours or more by Johnson, Morris, Cochrane, Dillard, Johnson's wife and daughter then thirteen years old. No mention is made of Johnson's father, except that he was there. They say they were intimidated by all of them; that each one of them had one or more pistols which they exhibited, and all wore officers badges and pretended to be officers including Mrs. Johnson. Evidence went in without objection that the accused confiscated, robbed or took the holster in which Vance carried his revolver, and also the pistol carried by Dorsey, although these articles are not mentioned in the indictment. Who appropriated them does not appear. Vance says he was "dragged" around the house and about the premises until he got mad and offered to fight any of them if they would lay aside the artillery. In this period of alleged detention the two state witnesses say that Johnson and perhaps Cochrane or Dillard asked them for money; and it was in this period that Dillard compelled Vance to write and

sign the check charged in the indictment as one of the articles of which he was robbed. Every act or word done or spoken by any of their alleged captors is treated by the prosecution as the joint act and word of all. The evidence for the defense is entirely to the contrary. It would serve no useful purpose to detail any portion of it except that which relates to the taking from the person of Vance the pistol, and the incident relating to the signing and delivery of the check to Dillard, the prohibition officer. Johnson and Morris say Vance was drunk when they arrived and was on horseback in Johnson's yard. Johnson knew him and addressed him as "Uncle Cal." Morris and Vance were entire strangers. As Johnson passed Vance on the way to the house, he was called back by the latter, and during a colloquy between them the efficient cause of the drunken condition of Vance was discernible in a bottle carried by him in his overcoat pocket. Morris took the bottle or attempted to take it out of the pocket when Vance became abusive, attempted to draw his revolver with a threat to shoot, when Morris drew his own pistol and told him to keep his gun where he had it. Cochrane and Dillard then came forward having witnessed the affair from the porch, and Dillard informed Vance that he would be compelled to place him under arrest for having in his possession moonshine liquor. Cochrane then attempted to take Vance off the horse, and Dillard went to Vance and disarmed him. They all then went into the house. The weather was cold and it was snowing. Johnson and Morris deny any knowledge of the execution of the check, or the purpose for or manner in which it was given. They are corroborated by Mrs. Johnson and her daughter. Dillard was dead and the whereabouts of Cochrane was unknown at the time of the trial. The evidence of Vance is exceedingly unsatisfactory; it is rambling, disconnected and contradictory. That of Dorsey is more intelligent.

The case for the state developed upon the theory that Dillard, Johnson, Cochrane and Morris were banded together for the purpose of committing the alleged robbery, aided by Johnson's wife, daughter and father, and that any act or declaration by any of them was the act and declaration of all. The evidence introduced seems to have been upon the

assumption that a combination and conspiracy had been formed for the purpose of committing a robbery. When the act of one is described it is designated by the state's witnesses as the act of all. Witness Lennie King was permitted to testify that on the day or day after the alleged robbery Dillard came to his house, situate about two and a half miles from Johnson's house, with a search warrant and there told him that he had robbed or "held up" Cal Vance and the "sheriff" of Clay county of a quart of liquor and had made them write a check for $75, which check Johnson and Morris, his "buddy," was to have cashed. This evidence, improper and incompetent, was clearly prejudicial. There was nothing to indicate a combination or conspiracy to rob, except the fact that Cochrane and Dillard were at Johnson's house when Morris and Johnson came home, and came to the assistance of the former in disarming Vance and Dorsey when the altercation occurred in the yard or near the gate, coupled with the evidence of Vance which is highly colored. Vance says that when Johnson and Morris approached the house on foot coming from the railroad station they drew their revolvers, ordered him to dismount, pulled him off his horse, took his pistol and liquor, his check book, grabbed his bag containing two warrants and other legal papers, without provocation or cause, assisted by Cochrane and Dillard, who came from the house, and turned their attention to his companion Dorsey, disarming him of a revolver which he carried. Dorsey's evidence does not correspond with that of Vance in that regard. He says Johnson and Morris came across the creek on foot and approached Vance who was on his horse, and after a conversation which he did not hear, and makes no attempt to detail, took him off his horse and disarmed him. He did not see them take the whiskey from Vance. He knew, however that Vance had liquor in his possession, a fact which Vance divulged to him on the journey to Johnson's house. There is much evidence that Vance and Cochrane were drunk. Vance says he was not drinking, and Dorsey thinks Vance was not drunk. The others, including Mrs. Johnson and her daughter (Johnson's father did not testify), say he was intoxicated to the extent of staggering, and used vile and

vulgar language.  It is rather a violent assumption unwar-
ranted by the evidence and circumstances to hold that there
was a combination and conspiracy to rob.  Morris did not
know Cochrane, and knew Dillard casually.  He was slight-
ly acquainted with Johnson; and Vance and Dorsey were en-
tire strangers.  There was not the slightest evidence of pre-
concerted meeting of the parties at Johnson's home.  No one
knew that Vance and Dorsey would be there at that time
or at any other time.  They stopped at Johnson's house
casually for the purpose of being directed to Auxier's home
where Dorsey intended to serve process in a civil suit.  They
admit that they tarried at Johnson's house for some time,
after the information desired was received.  There was
some cause other than robbery which impelled Morris and
Johnson to take Vance's pistol and liquor.  They state it.
They say he was drunk, had liquor in a bottle in his overcoat
pocket plainly visible, was abusive, and threatened to use
his revolver when his liquor was taken from him.  The
liquor was in two bottles, one about one-half full, and the
other with a small quantity.  Vance's explanation of his
possession of the liquor is rather unusual and peculiar.  He
says he was a constable from the adjoining county of Nicholas
and some justice of the peace had instructed him to be on
the lookout for intoxicating liquors.  The night before he
was out on that mission watching some house, and a man
told him to come down the hollow.  He went up a branch and
found this whiskey in an old coal bank and was taking it
as evidence to the justice of the peace.  He had made no
arrest.  Dillard was a prohibition officer, and it is in evi-
dence that he told Vance he would have to arrest him
for having in his possession this liquor.  After Vance and
Dorsey were taken to Johnson's house they staid there about
two hours, their horses having been put in the stable and
fed by Johnson, and while there it is alleged that the rob-
bery of the check occurred.  Dorsey was scared; he was
caught with a pistol carried contrary to law.  Vance had
not impressed upon the others his right to carry the pistol
and possess liquor; but after considerable parleying, during
which Vance declared he could whip any of those present if
the pistols were laid aside, they were permitted to leave,

with the injunction to go not in the direction of Auxier's house for whom Morris had a warrant, leaving their pistols, the liquor and the check.    No personal violence was threatened upon either Dorsey or Vance, except when they were disarmed.    No search of their persons, no money or other thing of value was taken from them, except the pistols, the liquor and the check.

The taking of the pistol and liquor from the possession of Vance under the evidence does not import a felonious intent.    Whether an arrest was made or attempted to be made is not clear.    Robbery is an aggravated form of larceny and the intent to steal the property at the time it is first taken is just as essential to the crime of robbery as the use of force in the taking.    *State* v. *McCoy,* 63 W. Va. 69; *Jordan* v. *Com.,* 25 Grat. 943; *Rex* v. *Hall,* 3 C. & P. 409; *Reg.* v. *Boden,* 1 C. & K. 395; Bishop Crim. Law (9th ed.) sec. 1162.    In *Jordan* v. *Com., supra,* Jordan, who had gone with others to rob Priddy, snatched a pistol from Priddy's hand when the latter was about to use it upon Jordan's companions; and afterwards carried it away and sold it. The court held that if the taking of the pistol by force was simply to prevent its use against the assailants, without the intent to steal it at that moment, it did not constitute the crime of robbery, although the prisoner afterwards appropriated the pistol, carried it away and sold it.    The court quoted with approval Lord Coke's saying, namely, ''The intent to steal must be when it cometh to his hands or possession; for if he hath the possession of it unlawfully, though he hath *animum furandi* afterward and carrieth it away, it is no larceny.''    What was the purpose of disarming Vance and taking from him the bottles of liquor?    Can we say from this record that the intention was robbery conceived and executed as soon as they saw him on his horse?    How did they know he had a revolver which they could steal? The liquor was in view, but the revolver was in a holster under Vance's outer clothing.    Of course if the taking of the revolver at that moment was a conception of the robbery borne out by the circumstances, the jury would be authorized to so find, and the crime would be robbery.    But as before stated, the case was poorly tried, and this distinc-

tion was not pointed out to the jury. The intent to rob at the time the article taken comes into the hands of the accused must exist in order to constitute the crime of robbery. The pistol was taken away by Dillard and turned over to Squire Jarrett by him, according to the evidence of Morris. He said he saw it on January 23, 1921, at Jarrett's office. There is no evidence that either of defendants, Morris or Johnson, carried the revolver away. There is another salient and striking fact which strongly repels the existence of criminal intent on the part of Morris. He staid all night with Johnson, proceeded next day to arrest Auxier in discharge of his mission as special officer, returned with his prisoner the following day and delivered him to Justice Jarrett where he was tried and convicted. There was no attempt to flee; no attempt at concealment. It is remarkable that Vance and Dorsey, upon leaving Johnson's house upon their horses, smarting under the humiliation of having been robbed by drunken men, did not immediately raise a hue and cry and bring the whole countryside to apprehend these robbers before their escape. It may be that defendants as well as Dillard were overzealous and stepped beyond their legitimate powers and duties in taking the pistol and liquor. Where an officer transcends his authority in the performance of what he conceives to be his official duty and carries property away in good faith it is not robbery, because the essential element of intent to steal is lacking. *In re Lewis,* 83 Fed. 159. In that case an illegal search warrant was placed in the hands of a deputy marshal accompanied by special employees of the treasury department. The latter in their zeal took property and committed acts beyond their authority even if the warrant had been legal, and were arrested and held to answer for robbery. They were released on *habeas corpus.* The court held that the criminal intent was lacking. Under the evidence some of the indictees may be guilty of some violation, but the facts and circumstances strongly repel any intention on the part of Morris or Johnson to commit the crime of robbery.

The Attorney General and counsel for defendant have raised the question as to whether the forcible taking by

Dillard of the check signed by Vance for $75 constituted robbery. The Attorney General insists that the act of forcing a person under duress to sign his own check on a bank constitutes the crime of robbery; and that the query propounded in *State* v. *McAllister*, 65 W. Va. 97, should be answered in the affirmative; while counsel for defendant assert that a check of this character, subject to contermand by the maker at any time, is of no value and can not be the subject of robbery from the maker. However, the state is content to rely upon the taking of the revolver as sufficient to sustain the verdict. Bishop says it is not robbery where one person compels another to write an order for money intending to take it away, but is intercepted, does not commit an assault with intent to rob; for if he had got off with the order the transaction would not in law be robbery. Bishop Crim. Law (9th ed.) sec. 748.

In our view of the case the alleged extortion of this check by Dillard from Vance has little bearing upon the guilt or innocence of defendants. The evidence of Vance as to the giving of the check is that Dillard took him into a room by himself while defendants were in another part of the house, and by threats of violence compelled him to draw the check payable to Dillard, but saying he would submit it to the others before he would let him go. He went out, leaving Vance in the room and afterwards returned saying, "it was all O. K., just as good as gold." Dorsey says a check was presented to Morris by Dillard who asked him if it was good, and Morris replied in the affirmative. Morris says he never saw the alleged check until on the 15th of the month at Jarrett's office when Dillard asked him to have it cashed so he could pay him a small debt, when he told Dillard he had no right to take Vance's check and tore it to pieces. But without considering what Morris says about the check, and considering the state's evidence alone, there is no intimation that either Morris or Johnson knew that Dillard had forced Vance to sign the check or that they participated in any way in its extraction from him. His remark that the check was "good" would not tend to show that he knew of any force in its procurement. It is rather remarkable that he would

pronounce as "good" the check of a man who was an entire stranger and about whose financial standing and ability he had no knowledge. It must be remembered that defendants are not charged with conspiracy. On the cross examination of Tip Johnson, the prosecuting attorney asked him how many times he had been convicted of "bootlegging," and when the court sustained an objection he sought to impress the jury that the witness was an habitual law breaker by asking him if he had not been convicted in the federal court for violating the prohibition law; if he had not served a sentence; and if he was not then under indictment for operating a moonshine still. To the last question defendant answered that he did not know. The court instructed the jury not to consider the answer. The design of these repeated illegal questions was to make a covert attack upon the character of defendant as a law abiding citizen, a matter which he had not put at issue, and although the court cautioned the jury not to consider the answer the impression was there and could not be effaced in that way. The object was to prejudice the jury against defendant, and no doubt had that effect. The persistence in this line of questions, after the court had ruled the first one out, we think was prejudicial to the defense. The character of the accused becomes an issue only where he voluntarily makes it so. The state is permitted to disprove good character only when so put in issue. *Robinson* v. *Com.,* 118 Va. 786. Even in civil cases where counsel has persistently called for testimony manifestly irrelevant and improper thus impressing the minds of the jury to the prejudice of the opposing litigant, this court has intimated, if not held, that such course was reversible error. *Moorefield* v. *Lewis,* decided this term. *Christie* v. *Mitchell,* 93 W. Va. 200; 116 S. E. 715; *Walters* v. *Appalachian Power Co.,* 75 W. Va. 676. It is much more important in criminal cases where life and liberty are at stake, to see that the accused is accorded a fair and impartial trial.

The jury, uninstructed on that point, may have concluded that because the revolver taken from Vance was carried away and not returned to him made defendants guilty of robbery irrespective of the motive and intention which inspired its

seizure when he was disarmed; that the taking by force and against his will, coupled with the subsequent alleged appropriation was sufficient to warrant a finding of robbery, irrespective of the motive which prompted the original taking, clearly indicated by the evidence and circumstances. , The introduction of improper testimony, the indirect and unwarranted attack upon the character of one of the accused, considered with the want of proper instructions on the law of the case, have impelled the conclusion that defendants have not been accorded a fair and impartial trial.

The judgment is reversed; the verdict set aside; and a new trial awarded.

*Reversed; verdict set aside; new trial awarded.*