NELLIE D. CROTTY, *Admx., etc. v.* THE VIRGINIAN RAILWAY COMPANY, *A Corporation*

(No. 7993)

Submitted October 31, 1934. Decided November 27, 1934.

H. E. De Jarnette, W. Cody Fletcher and John Hampton Hoge, for plaintiff in error.

W. H. T. Loyall and John R. Pendleton, for defendant in error.

HATCHER, JUDGE:

The plaintiff is administratrix of the estate of her deceased husband. The defendant railway company is engaged in interstate commerce. Plaintiff brings this action under the Federal Safety Appliance Act to recover damages for her husband's death which occurred while he was engaged in the performance of his duties as passenger engineer on a train of the defendant. He was killed in a head-on collision between his train, in motion, and a stationary freight train. Plaintiff charges that the collision was due to defective brakes on his train. She recovered a verdict, which was set aside by the trial court, and she prosecutes error.

Most of the material witnesses in this case were used by both parties with the result that there is no controversy over the controlling facts. The collision occurred a little more than a mile east of a railway station called Amigo. At that station the deceased had received his final orders to proceed east on the main line and pass a westbound freight train which was to take the Amigo siding at its east switch. That siding extends something over 6000 feet east of the station. It was the duty of the deceased to proceed towards the east end of the siding with his train under control for the following reasons: if the freight train should be fully on the siding, it was required of both the passenger engineer and conductor to exchange (viva voce) severally with the freight engineer and conductor the numbers of the respective trains;

and if the freight train should not be fully on the siding, it was incumbent on deceased to stop his train "in the clear" west of the east switch of the siding and there wait for the freight to take the siding. After leaving Amigo, the deceased accelerated the speed of his train until it was traveling at approximately thirty-five miles an hour. The fireman of the passenger train testified that when the train was about 2,000 feet east of the station, the deceased shut off the power and permitted the train "to drift"; that after drifting some five hundred feet (on a one-half of one per cent descending grade) and when about 2,700 feet from the east end of the siding, deceased made a "service application" of the brakes, and then put his brake lever "back in lap position" (the effect of the "lap position" was to retain the pressure already exerted and prevent any further release of air); that the service application reduced the speed of the train to approximately twenty-seven miles an hour; that when about 400 feet from the east end of the siding, the deceased moved the brake lever from lap to the emergency position; that the last move checked "the speed of the train considerably", but realizing the collision was imminent, the witness jumped from the engine.

The freight train was standing a few feet beyond the east switch of the siding preparatory to entering the siding. The speed of the passenger train at the moment of collision was estimated by various witnesses from twelve to twenty-five miles an hour. After the collision the engine throttle was found one-third open, the reverse bar in the reverse position, the sand pipes open, and the brake lever in the lap position.

The passenger train consisted of the engine, a baggage car and a passenger coach. The train was equipped with standard Westinghouse air brakes. The engine carried 120 pounds and the car and coach each carried 90 pounds of air pressure. The engineer could release exactly such pressure as he saw fit. The fireman did not know what pressure the deceased used in making the service application, but gave his opinion "from his experience" that from 15 to 20 pounds pressure was then released, that

20 pounds is sufficient for a service application, and that "you can't get a quick emergency" after a service application.

Plaintiff introduced expert testimony to the effect that if the brakes were in good working order a 20 pound service application should have stopped the train within four to five hundred feet.

The fireman further testified that after leaving Amigo he admonished the deceased two separate times before the service application was made "that he was meeting a man (the freight train) down there and to cut his speed down". The conductor and brakeman testified that the conductor had reached for the cord to apply the emergency brake at the exact moment when the deceased made the service application. The reason given by the conductor for his action was that the speed of the train was "too fast getting down that close (to the end of the siding)." The brakeman said the deceased "was going too fast and too short a space to stop in."

The defendant proved rigid inspection and proper repair of the braking system prior to the fatal day. On that day more than fifty stops had been made before the accident, with the brakes working properly. Counsel for plaintiff call attention to evidence that upon two of the stops the train ran about one-half car length beyond the usual stopping places. There is no evidence, however, even tending to show that at those two stops the brakes were not responsive. At the last stop prior to the collision (Amigo) the deceased used the brakes to "spot" the door of the baggage car on his train with the door of another baggage car on an adjacent train. In relation to the efficiency of the brakes in that instance the passenger conductor said: "It wasn't necessary to move backward or forward an inch." After the collision the brakes were found to be gripping tightly the wheels of the car and the coach. (Such an application is made automatically by auxiliary air tanks on each car, whenever the main air line from the engine is broken.) The following parts of the brake system were broken in the wreck: some small air line pipe fittings in the engine;

the "train line"; and a brake lever on the rear trucks of the passenger coach. All the fractures showed "conclusively" that they were "recent". The broken parts were replaced; after which a test was made at the direction of and under the inspection of a representative of the Interstate Commerce Commission, and the braking system worked "perfectly".

Counsel for plaintiff place reliance on the expression of two witnesses, experienced trainmen, that there was a "defect" in the brake lever at the point of fracture. The witnesses described the defect as a little circular indentation worn in the lever by one of its bolts. Both said there was no flaw in the metal. One said the metal was "bright"; the other said the break was "clean". One was of opinion the lever was not worn enough to weaken it. The other said positively that the indentation would not affect the strength of the lever under ordinary circumstances and that the lever had been "absolutely" strong enough to stand either service or emergency applications. He further testified that the impact had broken the center plate block and two of the center plate bolts on the rear truck of the coach, causing the truck to shift "back two inches off the body," and throwing a terrific strain on the lever.

With the so-called "defect" in the lever eliminated as evidencing a cause of the accident, the verdict is supported only by the alleged failure of the brakes to stop the train.

The Federal statute requires the maintenance of an efficient braking system. That requirement is held to be absolute. *Ry. Co.* v. *Taylor,* 201 U. S. 281, 52 L. Ed. 1061. Counsel for plaintiff relying on the expert evidence in connection with that of the fireman, cite such cases as *Didinger* v. *Ry. Co.,* 39 Fed. (2d) 798, which holds that if brakes are properly set, inefficiency of the braking system is established by the failure of the brakes to work. The expert opinion that the service application of the brakes, if working properly, should have stopped the train in four to five hundred feet is based on the assumption that a twenty-pound release of air was then made.

There was no foundation of fact for that assumption. The fireman merely advanced *an opinion* that the quantum of pressure released was from fifteen to twenty pounds. Counsel's reliance pends upon an assumption on an opinion. Without fact, the cumulation of hypotheses is futile. Jones Com. on Evidence (2d Ed.), section 1326. Moreover, as an experienced engineer, the deceased realized fully the effect he was obtaining by the service application; and the fact that he allowed the train to proceed some 2,300 feet without changing the application in any particular, indicates that he had obtained the effect he intended. We do not overlook the fireman's testimony that just before he left the engine the deceased applied the emergency brake. Even so, after the collision the brake lever was found in the lap instead of the emergency position. How long the brake remained in emergency and how else the lever was manipulated, if at all, before it was returned to the lap position does not appear. There is no satisfactory proof of proper brake setting. On the contrary, it appears that the delay in setting the brakes between Amigo and the east end of the siding was expressly disapproved by all of deceased's fellow trainmen.

The brakes worked perfectly at Amigo just a few minutes before the collision. They worked perfectly after the collision when the broken parts were replaced. If anything caused the braking system to fail between Amigo and the place of collision, it was one or more of the fractures. Nothing occurred between those two places to produce any of the fractures. The force of the collision was sufficient to produce all of them. Therefore, they are naturally attributable to the collision. The doctrine of *res ipsa loquitur* is not applicable unless the only reasonable conclusion to be drawn from the circumstances is that the casualty happened through the failure of the brakes to work. *Mayes* v. *Kansas Co.*, 121 Kan. 648, 651, 249 P. 599. Hence that doctrine does not apply here.

The judgment of the circuit court is accordingly affirmed.

*Affirmed.*