STATE OF WEST VIRGINIA *v.* FRANK CORBIN
(No. 8283)

Submitted February 26, 1936. Decided March 17, 1936.

HATCHER, PRESIDENT, and MAXWELL, JUDGE, dissenting in part; concurring in result.

*A. J. Rosenshine* and *Homer Strosnider*, for plaintiff in error.

*Homer A. Holt*, Attorney General, and *Kenneth E. Hines*, Assistant Attorney General, for the State.

KENNA, JUDGE:

Frank Corbin was convicted in the Criminal Court of Harrison County of voluntary manslaughter, and was sentenced to five years imprisonment. To the judgment of the Circuit Court of Harrison County, declining to grant a writ of error, he prosecutes this writ of error.

The first question to be disposed of is the state's motion to dismiss this writ of error. The order of the Circuit Court of Harrison County, declining to entertain defendant's application for a writ of error from that court, declined the writ "agreeable to the provisions of section 7, article 4, chapter 58 of the Code of West Virginia." The judgment of the Criminal Court of Harrison County was entered on the 26th day of December, 1934, and the order of the circuit court, refusing to award a writ of error, was entered on the 8th day of May, 1935. It will be observed that the order refusing the writ of error was entered after the expiration of the limitation of four months within which a writ of error from the circuit court could be applied for, and at a time when the application for a writ of error from the circuit court could not be renewed. The contention of the state on its motion to dismiss is that since the order refusing the application for a writ of error from the circuit court does not state that the application was refused because the judgment of the criminal court was plainly right, the order of the circuit court was not a final order which would form the basis for an application for a writ of error from this court, and hence that the writ of error here was improvidently awarded. The state relies upon the cases of *Truslow* v. *Payne*, 90 W. Va. 149,

110 S. E. 546, and *Blumberg* v. *Snyder,* 90 W. Va. 145, 110 S. E. 644. These cases are authority for the proposition that in order to render final an order of a circuit court, declining a writ of error to the judgment of an inferior tribunal, the order of the circuit court must state that the judgment of the inferior tribunal is deemed by it to be plainly right, and that the refusal of the writ of error is for that reason. However, the rule laid down in the two cases referred to appears to have been modified by the later holding in the case of *Williams* v. *Irvin,* 101 W. Va. 708, 133 S. E. 390, in which the second point of the syllabus, with emphasis supplied, reads as follows: "The law and rules governing this court in matters of appeals from circuit courts govern the proceedings on appeal, writs of error or supersedeas in civil cases from the Common Pleas Court of Cabell County to the Circuit Court of that County. An order refusing a writ of error is not final, unless refused on the ground that the order or judgment of the inferior court is plainly right, or *the period of limitation for the writ has expired.*" It will be observed that according to the *Williams* case, either one of two things is held to render final the order of a circuit court declining a writ of error to an inferior tribunal, namely, a refusal to entertain the writ of error on the ground that the order or judgment of the inferior tribunal is plainly right, or the expiration of the time within which an application for a writ of error to the circuit court may be made. Here the limitation had expired before the refusal of the writ in the circuit court, bringing this case plainly within the rule laid down in the *Williams* case.

However, we are of the opinion that the question raised in the case at bar does not depend upon the rule to be deduced from the three cases mentioned for the reason that, since their decision, the statute controlling writs of error in circuit courts to the judgments of inferior tribunals has been materially amended. That statute is now Code, 58-4-7, and, with emphasis supplied, reads in part as follows: " * * * but *in any case* where

the circuit court or judge rejects the petition, the petition and order of rejection, together with the record of the cause, may, within four months from the date of the order of rejection, be presented to the Supreme Court of Appeals, or any judge thereof in vacation, for an appeal from, or writ of error or supersedeas to, such order of rejection, * * *." The language quoted was not contained in the statute when the cases relied upon by the state were decided. It is perfectly plain that "in any case where the circuit court or judge thereof rejects the petition," whether stated to be because the judgment of the inferior tribunal is deemed to be plainly right or not, an application can be made to this court for a writ of error to the judgment of the circuit court. The legislation in question, we deem clearly authorized by section 3, of Article VIII of the Constitution of this state, defining the appellate jurisdiction of this court. That section, after conferring appellate jurisdiction in certain specified instances, concludes as follows: "* * * and such other appellate jurisdiction, in both civil and criminal cases, as may be prescribed by law." Therefore, we think there can be no doubt of the power of the legislature to enact the provision quoted from Code, 58-4-7. It is said that the rule that "in any case" where a writ of error to an inferior tribunal has been refused by the circuit court, an application may be made to this court, will result in circuit courts giving only perfunctory attention to applications there made for writs of error to inferior tribunals. It is doubtful whether this court should entertain the presumption that circuit judges will not faithfully and fully perform the duties assigned to them, but if it be admitted that they might or would, the question involved is one of legislative policy, not one to be determined by what this court believes the law in that respect should be. The motion to dismiss is, therefore, refused.

The defendant, at the time of trial, was a man 45 years of age and was a motorcycle police officer of the town of Nutter Fort, a small place located near Clarks-

burg. In addition to his duties as a police officer, he performed the functions of a street commissioner and also, from time to time, received payment of their water bills from residents of the town. He entered upon this employment March 16, 1934, and, prior to that time, had spent a number of years as a special officer for a local chemical company, had served five years as chief of police of the town of Lumberport, and had been a deputy sheriff of Harrison County during the incumbency of Ross F. Stout as sheriff. He first met the deceased, William Wilson, about the middle of the summer of 1934.

On the afternoon of November 7, 1934, a telephone summons was received by the defendant, Corbin, who was at the mayor's office, in the town of Nutter Fort, to come at once to the home of Enoch Longenette on the corner of Maryland and Washington Avenues. The message came from Mrs. Longenette. Corbin got on his motorcycle at once and went to the Longenette home, arriving there in three to five minutes. He drew up at the side of the house on Washington Avenue near the sidewalk going up to the back porch. As he did so, Mrs. Longenette informed him that she wanted him to go into the house and take Bill Wilson away; that he was in there drunk, had a gun and had threatened to kill her. Corbin took his blackjack from his right hip pocket, went up onto the porch and into the house.

The concrete walk from Washington Avenue to the back porch extends across the entire width of the house, the back porch being on the corner of the house away from Washington Avenue. Turning at right angles to the left to go up to the steps onto the back porch, the entrance to the kitchen of the house is at the left after the back porch has been reached, so that in entering the kitchen door a person would be facing Washington Avenue. There was a screen on the kitchen door that opened outward and the door itself opened inward, the hinge being on the left. Going into the door, the rear wall of the house is on the left, and on the right for a distance of three feet eight inches, there is another wall, so that

the door from the porch into the kitchen opens into an off-set or open vestibule in the kitchen some four feet wide and three feet eight inches deep before the kitchen proper is entered. The dining room opens upon the kitchen and the doorway is to the right in coming from the back porch. This door is set close to the right side of the wall between the kitchen and the dining room, so that the view into the dining room is obstructed upon entering the kitchen from the back porch by the wall of the vestibule or passageway which is first entered upon coming into the kitchen from the back porch. A person entering the kitchen could not see through the dining room door until he had taken two or three steps into the kitchen. Beyond the dining room is the living room, and two bedrooms and a bath are on the right in going from the back of the house through the dining room and living room to the front, one bedroom and the bath open upon the dining room, and the second bedroom opens upon the living room.

There were no eye witnesses to the actual shooting other than Corbin and the deceased. Corbin testifies that upon entering the kitchen from the back porch, he was immediately confronted by Wilson, who was standing in about the middle of the kitchen floor with a shotgun presented from his right shoulder and with the muzzle within about six feet of Corbin's head. Corbin states that Wilson exclaimed "God damn you", and that he saw his hand coming down upon and working with the trigger of the shotgun. He says at this time, he dropped his blackjack from his right hand and whipped out his pistol; that he fired once and that Wilson, still presenting the shotgun, "hunched down" and took a step or two toward the dining room; that after a momentary pause, he fired at Wilson four times as rapidly as he could. Corbin states that he does not know positively whether he changed his own position in firing or not, but that all of the shots were fired from the corner formed by the off-set to the right in entering the kitchen from the back porch. One of the balls from Corbin's gun lodged in the wall of

the kitchen at the corner of the wall between the kitchen and the dining room to the right upon entering the kitchen. Another ball entered the left-hand side of the mantel in the dining room, which is directly opposite the door leading from the kitchen to the dining room. A great deal of evidence was taken concerning the direction from which these two bullets had been fired and particularly as to the place where Corbin must have been standing when he fired the ball that lodged in the dining room mantel. The state's proof tended to show that the ball in the dining room mantel, judged from the direction that it must have entered the mantel, was fired by Corbin from a position in the dining room somewhat to the right of the doorway from the kitchen. The evidence of the defendant on this question tended to show that this ball was fired by Corbin from the position in which he said he was standing in the kitchen. This testimony is in conflict from generalities to minute details.

Wilson fell some two or three steps inside the dining room, and to the right of the door leading from the kitchen into the dining room, with his head near the door which entered the bedroom from the dining room. He was shot in the left arm about a third of the way up, in the left shoulder, in the head just in front of the right ear, and through the chest, this bullet entering the right side of the chest about midway back and passing entirely through his body, severing one or more of the large arteries around the heart, resulting in almost instant death.

Corbin states that after the shooting, he walked over and looked at Wilson, saw that he was dead, and left the house immediately by the back door. Other witnesses say that he was in the house approximately two minutes after the shots were fired, one witness for the state testifying that he estimated the time at about four minutes, and other witnesses for the defense placing it at less than two minutes. When Corbin came out of the house, the first person he saw was a Mr. Bland, who died before the trial, and with whom he immediately re-entered the

house. Corbin was in the house with Bland for two or three minutes, the defendant's testimony having the effect of minimizing this time and the state's the effect of prolonging it. It is not shown that Corbin was in the house after he left it immediately after the shooting except in the presence of others.

There are thirty-six bills of exception and thirty-three assignments of error. The fact that these assignments of error fall into certain categories to a degree reduces the necessity of discussing them in detail. There will be no attempt to discuss them *seriatim*, but we hope to be able to deal with all the questions of law from which they arise.

The first assignment of error has to do with comments that the prosecuting attorney was permitted to make over the objection of counsel for the defendant in his opening statement to the jury. In substance and effect, the prosecuting attorney said to the jury that under the law, the state was not permitted to show the reputation of the defendant as being that of a violent and dangerous person unless the defense first put his reputation in that respect in issue. There was an objection to this statement, which was overruled by the court, and the prosecuting attorney then amplified his first statement by saying to the jury that if the defense did attempt to produce testimony as to the good reputation of the defendant, then the state would proceed to introduce evidence to the contrary. There was an objection to this statement of the prosecuting attorney, but it was permitted by the court to remain before the jury. The effect of these statements was strongly to infer to the jury that while the law prevented the state from showing the bad reputation of the defendant in the respect relevant to the accusation against him, nevertheless the state was full-handed with proof on the question. This situation constituted an effective challenge to the defense to open the question of reputation, and, if the statements of the prosecuting attorney dwelt in the minds of the jurors when they considered their verdict, the fact that the defense failed to

accept the challenge could easily be construed as a confession of weakness on the question. It amounted to putting the question of reputation before the jury against the defendant's protest. *State* v. *Justice,* 107 W. Va. 490, 148 S. E. 843; *State* v. *Morris and Johnson,* 96 W. Va. 291, 122 S. E. 914; *State* v. *Conway,* 94 W. Va. 676, 120 S. E. 78.

There are a large number of assignments of error based upon proof adduced by the state, and elicited by the state on cross-examination, showing that the defendant Corbin had, on a number of occasions prior to the shooting, visited the Longenette home; on several occasions going inside the house and on a great many other occasions, stopping on his motorcycle in the street and talking with Mrs. Longenette as she stood in a window, or upon the porch, or in the yard. On one of these occasions, according to the testimony of one state witness, Corbin was seen in the Longenette home, seated in the living room, talking to Mrs. Longenette at about nine o'clock in the evening when her husband was not at home. In this same category, are other questions that the prosecuting attorney was permitted to ask, the purpose of which was to raise an inference of improper relationship between Mrs. Longenette and the deceased, William Wilson. From a reading of the entire record, it would appear that the purpose of the state was to create by this testimony the inference that at the time Mrs. Longenette met the defendant Corbin about the middle of the summer, 1934, and prior thereto, Mrs. Longenette had been receiving questionable attentions from the deceased, and that when Corbin came upon the scene, he was, on that account, provoked to resentment because of his own interest in Mrs. Longenette. The evident purpose of the state was to create from that inference, the further inference that at the time of the shooting, Corbin was actuated to kill Wilson in cold blood because of his resentment and jealousy. The record is entirely devoid of direct testimony of any improper conduct on the part of Mrs. Longenette with either the deceased or Corbin. Twelve witnesses

in the case of the state-in-chief were permitted to testify to visits of Corbin to the Longenette home, by far the larger number of them stating that they had never seen him inside the house, but always outside talking to Mrs. Longenette, who was either in the yard, upon the porch or at a window, while Corbin sat upon his motorcycle in the street. We are of the opinion that this testimony·was irrelevant and harmful. It called upon the jury to infer from circumstances, susceptible of a perfectly innocent interpretation, an improper relationship of which it was evident the state had no direct, or even circumstantial, evidence; and, upon that relationship, to build the inference that Corbin had some motive other than self-defense in the killing of Wilson. The law of evidence does not permit the building of one inference upon another inference. *Crotty* v. *Railroad Co.*, 115 W. Va. 558, 177 S. E. 609; *U. S.* v. *Ross*, 92 U. S. 281, 23 L. Ed. 707, and annotation found at page 798; *Atchison, Topeka & Santa Fe Railway Co.* v. *Baumgartner*, 74 Kan. 148, 85 P. 822, 10 Ann. Cas. 1094, and note; *Nations* v. *U. S.*, (C. C. A. 8th Cir.) 52 F. (2d) 97 (this case contains many citations on the question); *Titzer* v. *State*, 201 Ind. 643, 171 N. E. 7; *State* v. *Ross*, (Mo. Sup.) 300 S. W. 717; *Smith* v. *State*, 200 Ind. 411, 164 N. E. 268; *Moran* v. *State*, 179 Ark. 3, 13 S. W. (2d) 828. For a succinct statement of the general rule, see also 10 R. C. L. 870.

Concerning Wilson, the court permitted the prosecuting attorney to ask Mrs. Longenette if she had not telephoned a Mrs. Coucher at a time during the summer of 1934 to give Wilson a message to the effect that: "My husband is working from twelve noon until six o'clock in the evening, and come up to see me." This, Mrs. Longenette denied. The prosecuting attorney was further permitted to ask Mrs. Longenette how many times during the summer and fall of 1934 she had called Mrs. Coucher's house on the telephone to leave messages for Bill Wilson. Mrs. Longenette stated that she had sent no such messages to Wilson, explaining that she had, at times, sent messages to the Wilson·family about laundry that

she was doing for them. When, in rebuttal, Mrs. Coucher was produced as a witness, the state completely failed to justify the questions the prosecuting attorney had been permitted to ask Mrs. Longenette. Mrs. Coucher said that she would not recognize Mrs. Longenette's voice over the telephone, and the prosecuting attorney did not ask her concerning the apparent foundation he had laid to contradict Mrs. Longenette. The trial court should not have permitted the prosecuting attorney, over objection, to propound questions, the insinuations arising from which were so damaging to not only the case of the defendant, but to the reputation of the witness, without exacting an assurance that testimony to be adduced by the state at a later time would justify them. If the trial court regarded the questions themselves as constituting an effective assurance that they would later be justified by substantial proof in contradiction, then his mistake is demonstrated by the record.

The court would not permit the witnesses for the defense, Ralph Arble, Mrs. Auldra E. Hamilton and Mrs. Longenette to testify as to the substance of the telephone conversation between Mrs. Longenette and Corbin upon the occasion, immediately prior to the shooting, of her phoning to Corbin from the Hamilton home to come to the Longenette home. The avowals show that these witnesses all would have stated that Mrs. Longenette told Corbin that Bill Wilson was in her house drunk and had threatened to kill her, and to come and remove him.

Mrs. Longenette had testified that Wilson came to her home on the day of the shooting first sometime between one and two o'clock; that he knocked, and that she went to the door and saw that he was drunk; that she did not then answer his knock nor permit him to enter the house; that later in the afternoon, when he returned about four o'clock and renewed his efforts to get into the house, she let him in; that he at once started to quarrel and argue with her, seizing her roughly by the arm; that he left the kitchen, where they were, armed himself with her husband's pistol and, pointing the gun at her, threatened

to kill her; that she slipped out of the house after having talked to Wilson for sometime, met one of her sons coming from school and cautioned him not to go in, and went to the home of the Hamiltons, where she telephoned for the police. Corbin appears to have been, at the time, the only policeman of the town of Nutter Fort.

It is true that Corbin was permitted to testify as to what Mrs. Longenette said to him over the telephone. This does not cure the error arising from the fact that three apparently disinterested witnesses were willing to state this material fact in favor of the defendant. It is not a matter of superfluous cumulative testimony, neither is it a case of hearsay, as the trial judge apparently believed it to be. The obvious interest of Corbin in the outcome of the trial would naturally limit the effect of his statement on this question. The purpose of the testimony was not to prove the fact that Wilson was in the house nor the fact that he had a pistol, nor the fact that he had threatened to kill Mrs. Longenette. The material part of the testimony was to show that those statements had been made to Corbin as an officer of the law under circumstances that justified him in acting upon them. It was error for the court to reject this testimony.

An error closely related to the error last dealt with was when the trial court refused to permit Mrs. Auldra E. Hamilton and Mrs. Longenette to state what Mrs. Longenette had told Corbin immediately before the shooting when he arrived at the Longenette home, and started to enter it. The avowals show that both of these witnesses would have testified that Mrs. Longenette told Corbin that Bill Wilson was inside the house, that he had a gun and that Corbin had better be careful. It is true, again, that the trial court permitted Corbin to testify that Mrs. Longenette made such a statement to him at that time. As pointed out above, this did not suffice. Again, this testimony was not hearsay. Its purpose was not to prove that what Mrs. Longenette told Corbin was a fact, but simply to prove that such a statement had been made to him, and that upon that statement he was acting in good

faith when he entered the Longenette home. The materiality of the statement is as apparent as is the importance to the defendant of being able to establish it by independent and disinterested witnesses.    This rejection also was error.

The state undertook to show that Corbin, himself, had full opportunity to place both the shotgun and the revolver on or near Wilson's person after the shooting had taken place and before the arrival of the officers upon the scene. The shotgun was found with its stock under or near Wilson's right arm pit, with the barrel pointing toward his feet and raised some eight or ten inches above the floor. The pistol was shoved beneath his trousers and belt in front. One witness for the state testified that Corbin was in the house after the shooting some four minutes by himself. The defense testimony tended to reduce this period to two minutes or less. In connection with this testimony, the matter of fingerprints arose. C. W. Hissom, a member of the Department of Public Safety, was permitted to testify for the state that he went to the Longenette home in company with two other troopers of the state police at about seven-thirty in the evening on the day of the shooting, and was shown the shotgun and the pistol. The witness stated that both bore fingerprints at this time, those on the pistol being more distinct than those on the shotgun, because the former was nickel-plated and the latter blue steel. The witness testified that although the pistol and the shotgun were offered to him at this time, he did not take them away with him, but left them in the care of the Longenettes. The next evening he returned at about the same hour, but found that both the pistol and the shotgun were locked up and that the key to the place where they were kept was in the possession of Mr. Longenette, who was not at home. Later the same evening, he returned and got them. The witness testified that at the time he got them from the Longenette home, the fingerprints had been wiped off, or "swiped." In its case, the defense tendered the testimony of Paul Southern, an officer who seems to have had

equal, if not superior, experience in dealing with finger-prints to that of the state's witness, in an effort to show that if fingerprints had been obliterated from the guns, it might, and probably did, occur by reason of the manner in which they were handled after the question arose. This testimony was rejected by the court, over the objection of the defendant. The objection was due to the fact that the court sustained the state's contention that the defense witness could not qualify as an expert in fingerprints. We do not think it necessary to pass upon the question of whether either witness qualified as an expert or whether the testimony was, in fact, expert evidence. However, it is difficult to perceive why the state's testimony along this line should have been accepted and the defendant's rejected.

But the court's most important rulings in this connection were the rejection of the defendant's offers to show by Corbin and by the two deputy sheriffs who were the first officers on the scene of the shooting, arriving some thirty minutes after it had taken place, that Corbin himself had cautioned them and others present not to touch the guns until the coroner arrived, because of the fact that he, Corbin, wished to preserve any fingerprints that might be upon them. At the time that this testimony related to, whatever fingerprints may have been upon the guns were still upon them intact, the state's witness, Hissom, having testified that when he first saw the guns at seven-thirty that evening, the fingerprints were there. This evidence, if admitted, would have constituted substantial refutation of the inference the state sought to establish to the effect that Corbin had either obliterated the fingerprints himself or caused them to be obliterated in order to conceal proof of the fact that he, himself, had placed both weapons on and near Wilson's body. The evidence was not hearsay, its purpose not being to establish the truth of anything that Corbin said, but merely the fact that he said it. This fact, under the circumstances and at the time, was a most material part of his proof to meet that of the state. It was error to reject this testimony.

The defendant complains that the state was permitted to introduce in rebuttal evidence to the effect that William Wilson always fired a gun from the left shoulder. The shotgun having been found with the end of the stock resting near Wilson's right armpit, it would clearly be material for the state, on its theory that the weapons were placed on or near Wilson's body by Corbin, to show that the shotgun, if it had been in use by Wilson at the time he was shot, would have been found near his left, and not near his right shoulder. Furthermore, Corbin's written statement as to what had occurred at the time of the shooting had been introduced in evidence as a part of the state's case-in-chief. In this statement, Corbin declared that Wilson had presented the gun from his right shoulder. The statement, of course, did not make Corbin the state's witness, and it was quite relevant for the state to show, if it could, that Corbin had misstated the facts of the shooting on the theory that a deliberate misstatement of those facts would tend strongly to establish the guilt of Corbin. We believe there could be no doubt of the propriety and materiality of this testimony on the state's theory of the case. This evidence was introduced in rebuttal. It is more properly a part of the state's case-in-chief, but there seems to have been no prejudice resulting from the order of its admission.

The defense further complains because the trial court permitted the jury, at its request, to take to its room the written statement of Corbin concerning the facts of the shooting and the floor plans or plats of the Longenette home. Matters of this sort are usually regarded upon review as being based upon a broad discretion of the trial court. The danger, of course, in the practice of permitting jurors to take to the jury room papers and exhibits, lies in the fact that it may unduly emphasize in the minds of the jury the phases of the evidence represented by the matter taken to the jury room, to the detriment or minimization* of other evidence of equal or greater importance. This, naturally, is the theory of the defendant's objection to the action of the court in the case at bar.

However, although the practice undoubtedly is one to be followed with caution, we cannot, in this instance, see that the discretion of the trial court was abused in permitting the jury to have the statement and plats in its room, nor in refusing the request of the defendant that all of the testimony of Corbin be read to the jury in the event that his written statement was permitted to go to the jury room.

The defendant complains that the court gave instructions Nos. 1, 3, 4, 5, 6, 7 and 8 on behalf of the state and refused to give instruction 18 on behalf of the defendant. These instructions, along with the cases relied upon, both to overthrow and sustain them, have been carefully examined. In some instances, technical inaccuracies possibly exist in instructions that were given on behalf of the state and objected to by the defendant. However, we are of the opinion that no substantial questions arise in the case upon the instructions. We, therefore, do not deem it necessary to discuss them in detail.

One further assignment of error relates to the action of the court in refusing to permit counsel for the defendant on cross-examination to ask certain witnesses for the state if they had not, at times previous to the trial, and within a few weeks or months, been arrested by Corbin. Undoubtedly, this was legitimate cross-examination for the purpose of developing any bias or prejudice against the defendant that might, or did, arise on account of the arrests. However, the defendant himself was permitted to state that he had in fact arrested each of the witnesses in question. This, in our opinion, prevents the question from constituting reversible error. The defense contends that it should have been permitted to prove the fact of these arrests by the introduction of the record of the police court of the town of Nutter Fort. Since there was no issue raised as to the fact of these arrests, we are of the opinion that the trial court did not err in so restricting the testimony upon this collateral question.

There are several other assignments of error more or

less directly connected with the assignments already discussed and decided. These, we do not believe that it is necessary to deal with.

For the reasons herein stated, the judgments of the Circuit and of the Criminal Court of Harrison County are reversed, the verdict of the jury in the Criminal Court of Harrison County is set aside and the defendant awarded a new trial.

*Reversed and remanded.*

MAXWELL, JUDGE, dissenting in part; concurring in result:

For the reasons set forth in the opinion, I concur that there was prejudicial error at the trial, and, the majority of the court declining to dismiss the writ of error as improvidently awarded, I concur in the reversal. But it is my view that we should sustain the motion of the state to dismiss the writ of error as improvidently awarded, and remand the case to the circuit court for definite action, either affirming or reversing the judgment of the criminal court. I consider that the defendant's petition is still pending in the circuit court, awaiting definite action.

There can be no writ of error from this court directly to a judgment of a criminal court. *Robinson* v. *Railroad Co.,* 80 W. Va. 290, 92 S. E. 441. Writs of error from this court apply to judgments of circuit courts. Records of criminal courts can reach the supreme court of appeals for review only through the circuit courts. It is my opinion that a judgment of conviction of a criminal court cannot be reviewed by the court of last resort of the state until the criminal court's action has been affirmed by a circuit court.

After his conviction in the criminal court of Harrison County, the defendant petitioned the circuit court of that county for a writ of error. That court entered an order refusing the writ of error, but did not recite that the judgment of the criminal court was affirmed. Nor was there a recital that the judgment of the criminal court

was plainly right, as contemplated by the act creating the criminal court. Acts of the Legislature of 1909, chapter 27, section 20. In a similar situation, this court, in *Blumberg v. Snyder,* 90 W. Va. 145, 110 S. E. 544, dismissed as improvidently awarded a writ of error because a circuit court in approving the judgment of an inferior trial court had not stated in the order of refusal that in the circuit court's opinion the judgment of the inferior tribunal was plainly right. The statutory provision there involved and the cited provision of the Harrison County Criminal Court Act are practically identical. The holding in the *Blumberg* case was followed in *Truslow v. Payne,* 90 W. Va. 149, 110 S. E. 546, and *Williams v. Irvin,* 101 W. Va. 708, 133 S. E. 390.

The circuit court's action in passing this matter on to the supreme court without express affirmation or without recital that in the circuit court's opinion the judgment of the criminal court was plainly right, is sought to be justified under a statutory provision which was newly adopted in the Code of 1931. The particular provision upon which reliance is had reads: " * * * but in any case where the circuit court or judge rejects the petition, the petition and order of rejection, together with the record of the cause, may, within four months from the date of the order of rejection, be presented to the supreme court of appeals, or any judge thereof in vacation, for an appeal from, or writ of error or supersedeas to, such order of rejection, * * *." Code, 58-4-7. In so far as this statutory provision would seem to authorize the transmission of such matter by the circuit court to this court without the circuit court's affirmation of the trial court's order, I am of opinion that it is unconstitutional and void, because in contravention of a provision of section 3, Article VIII of the Constitution of West Virginia. The provision reads: "It (supreme court of appeals) shall have appellate jurisdiction in criminal cases where there has been a conviction for felony or misdemeanor in a circuit court, and where a conviction has been had in any inferior court and been affirmed in a circuit court, * * * and such other appellate jurisdiction, in both

civil and criminal cases, as may be prescribed by law." The requirement seems plain that in respect of a judgment of an inferior court, there must be an affirmance by the circuit court before there can be a review by the supreme court of appeals. The reason of this requirement of our organic law is evident, namely, that both the litigant who seeks review of his case and the supreme court of appeals shall have the benefit of the judgment of the circuit court. If the circuit court is doubtful of the correctness of such judgment, and therefore does not affirm it, the litigant ought not to be put to the expense and trouble of bringing his case to the supreme court of appeals, and that court should not be required to review a matter of which the circuit court should have disposed. In its order refusing a writ of error, the circuit court refers to its "reasons announced from the bench." There was no written opinion, but counsel for the defendant state in substance on brief that the circuit court expressly refused to affirm the criminal court's judgment—merely declined to award a writ of error. In my judgment, that procedure is not warranted by the law. Such procedure, seemingly contemplated by the new statute quoted, will have the practical effect of bringing cases directly from special statutory courts to the supreme court of appeals through the mere *pro forma* action of the circuit courts. I am of opinion that such is not within the letter or spirit of the constitutional provision quoted.

To the suggestion that the latter part of said constitutional provision vesting the supreme court of appeals with "such other appellate jurisdiction, in both civil and criminal cases, as may be prescribed by law," warrants the above quoted portion of the statute, I reply that this latter constitutional provision, being general in its terms, is intended to apply to matters not otherwise specifically dealt with in the same section. Illustrative of the matters comprehended thereby are certifications of questions pertaining to the sufficiency of writs and pleadings, Code, 58-5-2, and review of trial court judgments holding indictments insufficient. Code, 58-5-30.

It is my conception of our judicial structure that there may be no review by the supreme court of appeals of a judicial matter on its merits unless there be a judgment or decree of a circuit court rendered on the merits, and that where the trial was had in an inferior court, in order that there may be review by the supreme court, the circuit court's order must unequivocally declare the circuit court's affirmation.

For reasons stated I dissent from Syllabus one and the portion of the opinion in harmony therewith. Otherwise, I concur.

Judge Hatcher authorizes me to say that he concurs in the views herein expressed.