# CHARLESTON

## STATE v. GUNNOE.

Submitted September 3, 1914. Decided September 22, 1914.

1. HOMICIDE—*Expert Testimony—Admissibility.*

    In case of homicide caused, in a physical struggle, by strangulation, according to expert and uncontradicted testimony, it is competent for a physican, who at the autopsy conducted by him on the body of deceased shortly after death observed a bruise or scratch on the face of accused, then present, to express, upon the trial, the opinion that such wound was a fresh break in the skin, had fresh blood in it, and was caused by a finger nail. (p. 742).

2. CRIMINAL LAW—*Instructions—Reasonable Doubt—Reference to Evidence.*

    An instruction on a trial for murder meant merely to define reasonable doubt, and saying ''beyond all reasonable doubt'' does not mean ''beyond all possible doubt'' and that ''what jurors believe as men they should believe as jurors'', is not erroneous, warranting reversal, merely because it omits an express reference to the evidence. (p. 743).

3. SAME—*Argument of Counsel—Failure to Examine Witness.*

    Ordinarily, it is not reversible error for a prosecuting attorney, in argument before the jury, to refer to failure of accused to examine material witnesses, summoned in his behalf, for the purpose of explaining incriminating circumstances disclosed by the evidence for the state. Such remarks are not within the inhibition of §19, ch. 152, Code. (p. 744).

4. SAME—*Conduct of Trial—Refusal to Call Witness.*

    A prosecuting attorney may, in the exercise of reasonable discretion, refuse to call as a witness one accused of, though not in-indicted for, the same offense, if he believes the testimony of such witness, if given, would tend to defeat, and not promote, the ends of justice. (p. 745).

5. HOMICIDE—*Criminal Law—Circumstantial Evidence—Sufficiency.*

    While circumstantial evidence is always to be scanned with great caution, and to sustain a verdict of murder must be of such character and tendency to produce a moral conviction of guilt beyond reasonable doubt, it will be held sufficient when as to time, place, motive, means and conduct the circumstances concur in pointing out the accused as the perpetrator of the crime; the test of sufficiency being that the facts proved can reasonably be account-

ed for only on the hypothesis of guilt, are consistent therewith, and point to it so clearly as to satisfy the jury beyond reasonable doubt. (p. 745).

Error to Circuit Court, Kanawha County.

Willard Gunnoe was convicted of murder in the second degree, and brings error.

*Affirmed.*

*Stone & Wolfe, B. T. Clayton, J. Howard Hundley* and *M. F. Matheny,* for plaintiff in error.

*A. A. Lilly,* Attorney General, and *John B. Morrison* and *J. E. Brown,* Assistant Attorneys General, for the State.

LYNCH, JUDGE:

Having been adjudged guilty and sentenced to confinement in the penitentiary for murder in the second degree, upon evidence wholly circumstantial, Willard Gunnoe seeks reversal upon writ of error.

By the first bill of exceptions, defendant invites consideration of a ruling upon the refusal of the prosecuting attorney to permit his counsel to interview Ocie Mullins, a sister of the deceased, and who then was, and until after the indictment and conviction of Gunnoe remained, in jail, jointly accused with defendant of the same offense. This assignment, however, we need not discuss; because subsequently, and before the trial, counsel did interview her, and, although summoned, she was not examined as a witness upon the trial.

By another assignment, defendant challenges the right of a witness examined as an expert, who performed or assisted in performing an autopsy upon the body of deceased, to state an opinion as to the nature, character and cause of a bruise or scratch on defendant's face, which he examined or observed on that occasion, and to say it was a fresh break of the skin, that it had in it fresh blood, and that in his opinion the break in the skin was caused by a finger nail. Other witnesses observed the same marks, and expressed the same opinion without objection or exception. We think it entirely competent for a physician, the practice of whose profession necessitates frequent examinations of wounds upon human bodies, to ex-

press an opinion on the appearance of wounds observed or examined by him. The injured part could not, for obvious reasons, be produced upon the trial in the condition in which it at first appeared. Without such evidence, the jury could not form any definite conclusion as to its nature, cause or character. *State* v. *Welch*, 36 W. Va. 690; *State* v. *Henry,* 51 W. Va. 283; *Overby* v. *Railway Co.*, 37 W. Va. 524; *Kunst* v. *Grafton*, 67 W. Va. 20. In the *Musgrave Case*, 43 W. Va. 672, on which plaintiff relies, the evidence deemed inadmissible, and for which the case was in part reversed, was given by a non-expert witness. We therefore do not deem the ruling on the admissibility of the evidence complained of prejudicial to the accused.

By another assignment, accused complains of two instructions given on behalf of the state. In substance, the first explains what is meant by reasonable doubt, saying "beyond all reasonable doubt" does not mean "beyond all possible doubt" and that "what jurors believe as men they should believe as jurors". The defect suggested is that the instruction makes no reference to the evidence, contrary to the holding in *Britton* v. *Oil Co.*, 81 S. E. (W. Va.) 525. The syllabus cited says: "Instructions requiring the jury to pass upon issues of fact should not omit reference to the evidence". But the instruction under review here does not purport to advise upon any such issue. It merely defines reasonable doubt—the open sesame to which resort is frequently had to acquit persons charged with crime. In part, it accords with an instruction approved in *State* v. *Ice*, 34 W. Va. 244, the difference being that the latter adds, "but proof to a moral certainty rather than to an absolute certainty", instead of the concluding phrase of the state's instruction given in this case. But, substantially as given, the instruction has been approved in *State* v. *Bickle*, 53 W. Va. 599; as has also been the second instruction in *State* v. *Sheppard*, 49 W. Va. 585, the two, with but an immaterial change, being in the same language.

Defendant, by his first instruction, refused, challenges the sufficiency of the evidence, discussion of which is for the present reserved. Except 1, 2 and 6, the trial court gave all the instructions asked by defendant. Because of the sub-

stantial sameness of instructions 2, 6 and 7, the last of which the court gave, we think the refusal to give 2 and 6 was not prejudicial. Besides, the language of 6 is ambiguous, and, moreover, as to some of its phrases, is without any evidence on which to base it. There was no evidence tending to show commission of the crime by any person other than the accused. The absence of any argument touching 2 and 6 lends color to the view that both were in fact given; because, as appears from the record, they were endorsed as given, although a bill of exceptions says they were not given.

This brings us to a consideration of the further objection arising out of the argument for the state and for the accused, each of whom sought to impress the jury with inferences to be drawn from the failure of the other to call Ocie Mullins as a witness. Although summoned, neither of them ventured to examine her. No doubt, she could have furnished information valuable or fatal to the success of the prosecution—which we do not know. And again counsel for the state said: "There are witnesses now in the court room for the defense who saw Willard Gunnoe the day before" the crime, not put on the stand to show, as Gunnoe contends, that the scratch alluded to was on his face the day before his wife's death. The statute, §19, ch. 152, Code, upon which the objection is based, changing the common law rule as to the privilege of the accused to testify in his own behalf, provides only that failure to make such request shall not create any impression against him, nor shall any reference be made to nor comment upon such failure by any one during the progress of the trial in the hearing of the jury. It is apparent that no such remarks or comments were made; and we can not perceive in what respect, if any, defendant was prejudiced by the argument of counsel. For comments of the character first indicated have been held either proper, or at least not so improper as to require a reversal. *State* v. *Ice, supra; State* v. *Parker,* 172 Mo. 192; *Richardson* v. *State,* 42 Tex. Cr. 311. Comment on the failure of accused to explain incriminating circumstances, as his flight from the state, or that he had not accounted for his whereabouts at the time of the homicide, is not objectionable as referring to failuer of accused to testify. *State* v. *Smokalem,* 37 Wash. 91;

*Sutton* v. *Com.,* 85 Va. 128; *Robinson* v. *Woodford,* 37 W. Va. 377. If from the hostile attitude of a witness, or his probable connection with the commission of the crime charged against the accused, unfavorable testimony may reasonably be anticipated, the state may, in the interest of public justice, refuse to call him to testify upon the trial. *McQuire* v. *State,* 2 Oh. C. D. 318. And, upon a like failure of the accused, an argument, based upon and limited solely to such failure, is not a comment within the inhibition of the statute. *State* v. *Sanderson,* 83 Vt. 351; *Lam Yee* v. *State,* 132 Wis. 527. It has been held otherwise, however, where it was argued that the guilt of the accused was to be inferred from such failure. *State* v. *Fitzgerald,* 68 Vt. 125; *Blackman* v. *State,* 78 Ga. 592. And likewise where comments unfavorable to accused are made as to what such witness would probably state if examined. *Graves* v. *United States,* 150 U. S. 118; *State* v. *Taylor,* 134 Mo. 109. But the argument in this case was properly limited, and made in reply to a statement by counsel for accused that the state should have called the witness Ocie Mullins.

What, then, were the facts upon which the jury based its verdict, the court its judgment upon defendant's motion for a new trial? Willard Gunnoe was on March 16, 1914, a dairyman, supplying milk to his customers in Kanawha City. With him lived his wife, Nora, the deceased, Ocie Mullins, her sister, and Tolbert Hundley, defendant's employee. Between six and seven o'clock in the morning of that day, being Monday, Nora Gunnoe was found dead, her body prostrate on the floor, face upward and partially covered with an apron. Without doubt, she was alive after the evening meal late on the preceding Sunday evening. Hundley says he saw her then; the exact time he does not fix, though requested to state it as nearly as he could. Nor can there be any reasonable doubt she was also alive on the morning of the 16th; because she was dressed and, as clearly and indisputably appears, had been somewhere and at some time out of the house that morning, for her shoes and clothing had on them fresh mud and were wet. Where accused and Ocie Mullins were that morning prior to the discovery of the body, no proof

enables us to say; and there is not the slightest evidence on
which to base any suspicion even of the presence in or about
the Gunnoe home of any other person who could have caused
Mrs. Gunnoe's death or who had any motive in promoting it.
Hundley could not have done it, and, as far as we are advised,
had no such motive. He says, and is not contradicted, nor is
there any suspicion of the falsity of the statement, that on
Sunday evening he went to his uncle's house, about a mile
from Gunnoe's, and there remained all night. Without stat-
ing who made the request, he says, "they (clearly meaning the
Gunnoes) told me while I was over there to get them (coffee
and lard as well as he recollects) if I could get in the store",
it appearing that some one conducted a store near his uncle's.
On returning early Monday morning about six thirty o'clock,
as the evidence clearly indicates, he found Willard and Ocie
Mullins near the barn, the front door of which was about
thirty feet from the door of the room in which the body of
Mrs. Gunnoe was found. Willard was then milking the cows,
and Ocie was in the milk house, located in the barn lot or
yard and about half way between the barn and house.
Hundley says that, after the first casual salutation between
him and Gunnoe, the latter said, "Go out and ask Nora if she
needs anything, then go over to Mr. Finnigan's and get
them". He said he went to the house, first entered the dining
room, "and then turned into the kitchen", where, according
to his own language, "I found Mrs. Gunnoe lying there", and
"an apron lying kind of over her face". "Her clothes were
kind of up around like her knees". After he called her name
four or five times, as he says, and got no answer, he returned
to the barn. "I called for Mr. Gunnoe there, when I got back
pretty near to the barn, and told him, asked him what was the
matter with her, as well as I recollect, and he said, 'why'? I
says, 'she is either dead or something is the matter with her'.
I don't recollect whether he said anything else or not".
Hundley and Gunnoe then went to the house together; but
Hundley does not recollect whether Gunnoe went in the
kitchen or not, as "he was a step or two in front of me". He
says Gunnoe remarked, "Oh, my God! yes, she is dead", but
did not go to the body or touch it or pull the apron off her

face, but "turned around and came back out"; and "when he turned and came out he didn't say anything, but went back to the barn and told the girl and said to her, 'that woman is dead or has killed herself', something like that, and then he went over in the bottom to tell the people". He then directed Hundley and Ocie to "go ahead and finish milking".

While the three physicians who conducted the autopsy say the body was cold when they first examined it between ten and eleven in morning, they were unwilling to say, and declared the inability of the profession to say definitely, what length of time within the first six hours life may have first become extinct. The witnesses, including the physicians, who saw the body and examined the room where it lay, agree in saying there were visible indications of a struggle; that there were scratches on the face and neck, and bruises at several places on the body; that a ring she wore "had cut clear into her finger and cut a notch in the skin clear across the back of the finger"; that "there was a scratch on her throat, bruises on her shoulder, and on each hip, a little skinned place on the hand", and blood in her ear; fresh mud in and about the kitchen, on the stove near which the body lay, on the legs of the kitchen cabinet, and "splotches of mud all over her shirt and underwear and stockings", and covering and extending to the top of the shoes, which were also wet, as was also the floor about the body, but not elsewhere, as if recently partially scrubbed or mopped. A partially filled bottle of carbolic acid was found, with the label torn off, on top of the kitchen cabinet, near which the body lay, but not within reach from the floor, the cabinet being from sixty to sixty-six inches in height, and a towel having the odor of carbolic acid was hanging in the milk house. There were imprints of foot marks on the floor, in and about the stove and cabinet, caused by shoes carrying fresh mud. A loose apron partially covered the face, and an over-turned pan containing potatoes and potato parings stood under the stove.

Moreover, and as if to create the impression of death by suicide, expert testimony, when fairly considered, tends strongly to indicate, and indeed we deem it sufficient to warrant the belief, that some human instrumentality other than

74 W. Va.

deceased had freely applied carbolic acid to the face and lips and poured it into the mouth of deceased after death. For the physicians say the acid was poured into the mouth while the body lay on the floor, and not as it must have been if administered by Mrs. Gunnoe while in a standing, sitting or reclining attitude, and that if administered by her while alive with suicidal intent she would evidently have swallowed the acid. This conclusion follows necessarily from the fact that the acid marks, plainly apparent, instead of indicating a course downward toward the lower extremeties, indicated a course from the mouth around the face toward the ears and the back of the neck, and the further fact that, although the mouth had in it visible acid marks, but little had extended beyond the throat and none of it further than the upper end of the esophagus, and therefore none of it had penetrated the stomach, which, as well as the heart, the testimony shows, was in a normal and healthy condition.

As a further circumstance, it is shown by the testimony of the witness Jarrett that, before day-light on the morning the dead body was discovered, the accused and Ocie Mullins by their joint conduct manifested unusual activity about the house, going from rear to front, outside and inside, and back again, several times. A further significant fact was the apparent indifference of the accused to his wife's death, as indicated by his deliberate attitude, his solicitude about the care of the milk, his incoherent remarks to different persons, and the absence of any attempt on his part to ascertain or to explain to the various witnesses the cause or manner of the injuries inflicted upon her resulting in her death—potent circumstances which the jury could rightly consider in determining the guilt or innocence of the accused.

. Thus was clearly established the corpus delicti; and, so far as they expressed any opinion, the experts agree in saying that the death of Mrs. Gunnoe was caused by violence, and that the violence was in their opinion by strangulation.

Upon the evidence thus, we think, fairly summarized, the jury returned its verdict, the intermediate court overruled defendant's motion for a new trial, and the circuit court, upon application thereto, refused his petition for writ of error.

Except upon rulings heretofore considered, it is not contended defendant did not have a fair and impartial trial. It therefore remains for us to say whether the evidence detailed is sufficient to sustain the judgment of conviction.

Who but Willard Gunnoe could, under this proof, have caused the death of his wife? As noted, the record is void of proof tending to raise any suspicion of the presence of any person near the Gunnoe home with any motive or purpose to serve or with any opportunity to commit the crime, unless it was Ocie Mullins, sister of the deceased. That she did it, or could have done it unassisted, is incredible, under the circumstances of this case. If she was an accomplice of Gunnoe, as probably she was, her participation would not of course excuse him. While counsel for Gunnoe do not in argument, or otherwise, suggest any other person as probably guilty, it is incredible that any person other than accused could have successfully caused the death without the knowledge of the husband and sister, both of whom were within thirty feet of the scene of the crime if it occurred in the kitchen. The door of the kitchen was open, according to Hundley and Jarrett, and clearly visible to both of them. Besides, there is some evidence even tending to sustain the theory that an earlier assault occurred that morning in the barn yard. Witnesses say there were fresh foot and knee prints in the mud indicative of a struggle there. Though not essential to establish guilt of the accused, that theory finds colorable support, in view of the jealousy on the part of Mrs. Gunnoe, elsewhere noted, of the intimacy she seems to have thought existed between her husband and her sister, proof whereof she may have sought to obtain by concealing herself in the barn, and there, being discovered or finding her suspicions fully warranted, exposing both of them, resulting in the assaults, first in the barn yard, then in the house. While, as we say, ignoring this theory, because without it we would still deem the evidence sufficient to warrant conviction, still the proof referred to was before the jury as one of the facts to be considered by it.

With the corpus delicti established beyond doubt, and the proof of circumstances forcefully pointing toward the accused

as the real culprit either alone or in conjunction with Ocie Mullins as an accomplice, we may inquire whether the accused had any motive or purpose in effecting the death of his wife. We have mentioned her suspicions of the intimate relations between her husband and her sister. What is the proof? Summerfield heard an altercation between Gunnoe and his wife about two months before her death, wherein she said to her husband, "You know you are courting her here right under my nose", to which, in language too profane for repetition, he replied, "Shut up your damned mouth and go in the house". And the witness Hundley, who for three months had resided with them, stated: "I have heard them have quarrels at times. Yes, sir. What did they quarrel about? Just whatever would come up; about first one thing or the other. I recollect her saying she didn't have any use for the girl there, and she wasn't any help to her, and she wanted to get rid of her, something like that, and have quarrels about her. About whom? Her sister, Ocie Mullins". It may be said, and said truly, that the improper relation, if any, existing between the accused and his sister-in-law furnished as much motive for the one as for the other to commit the crime. We have no disposition to controvert that statement. It may have so far operated to influence both of them that they joined in the commission of the offense, and perhaps did join in it; and, if both had been indicted and convicted, we should be inclined to say that it did so operate upon both of them. But, as already stated, we deem it incredible that Ocie Mullins committed or attempted to commit the offense alone. If she participated at all, it was in conjunction with her paramour or affinity. Unexplained as it is, we may say, in view of the evidence, that it afforded the accused, not a legitimate but to him perhaps a reasonable excuse for the criminal assult upon his wife.

Generally speaking, touching the proof, we may say that, in our view, it was sufficient to lead the jury to the conclusion, as it evidently did, that the accused was the real assailant; and that the jury could not, without ignoring the evidence, reach any other conclusion, unless, knowing the witnesses and observing their demeanor, they were unwilling

to give credence to their statements. The books are full of cases sustaining verdicts of juries, in civil and criminal cases, based exclusively upon evidence no stronger in its circumstances than those detailed by the witnesses in this case. One of such cases is *Dean* v. *Com.*, 32 Gratt. 912, wherein, while prefacing its holding by the admonition that circumstantial evidence must always be scanned with great caution and to justify a verdict of murder in the first degree the circumstances must be of such character and tendency as to produce a moral conviction of the guilt of the accused beyond reasonable doubt, the court held the accused was properly convicted of murder in the first degree upon evidence which "as to time, place, motive, means and conduct" concurred "in pointing out the accused as the perpetrator of the crime"; the test of sufficiency to support the conviction being that the facts which the jury accept as proved can be reasonably accounted for only on the hypothesis of the guilt of the accused, are consistent with it, and point to it so clearly as to satisfy the jury of it beyond a reasonable doubt.

It was, therefore, for the jury, composed, as it no doubt was, of reasonable men, duly impressed with the gravity, importance and responsibility of their situation, to say, as they have said, whether, if they believed this evidence, the defendant was the efficient actor in the commission of the offense charged against him; and, if they believed him guilty, as they evidently did, "to a moral certainty and beyond reasonable doubt", their verdict must be sustained, unless we believe it to be clearly wrong. We do not so find it. The jury and the trial judge, who saw and probably knew the witnesses and heard them testify, and the judge of the circuit court who read and considered their testimony upon petition of the writ of error, deemed the evidence sufficient for conviction—an opinion in which we do not hesitate to concur.

We therefore affirm the judgment.

*Affirmed.*