# CHARLESTON.

State *v.* Mat Justice

(No. 6201)

Submitted May 14, 1929.     Decided May 21, 1929.
(Rehearing Denied July 17, 1929).

*S. U. G. Rhodes* and *G. R. C. Wiles,* for plaintiff in error.

*Howard B. Lee,* Attorney General, *W. Elliott Nefflen,* Assistant Attorney General, and *James Damron,* for the State.

WOODS, PRESIDENT:

The defendant, Mat Justice, was indicted upon a charge of killing one Joe Daniels. The jury found him guilty of

murder in the second degree, and now he prosecutes this writ from the judgment entered thereon.

The shooting occurred late Sunday afternoon, the 26th day of June, 1927, along the N. & W. Railway, between Lindsey and Glen Alum, Mingo county, and within a few hundred yards of defendant's dwelling, which is located just across Tug River in Kentucky. Joe Daniels, together with his wife and children had been staying at the home of the defendant for approximately two weeks. On Saturday, a number of men (mostly relatives of the accused) arrived and remained over Sunday. The reason for the assembling of this conclave at the home of the prisoner on this particular Sunday is not satisfactorily accounted for by the conclavists. It appears, however, that there was some card playing there and some moonshine liquor consumed—the burden of the defense witnesses being to fasten the latter act upon the deceased alone. Along in the evening at six o'clock the deceased, Mary Daniel, daughter of deceased, Paris Charles, and Bessie Carter went over to the West Virginia side of Tug River. Subsequently Zeb Justice and Boyd Justice (Boyd did not testify at the trial of this case) left the defendant's home and went across the river to meet defendant's wife, who had been to church and was returning on a late afternoon train. After crossing the river into West Virginia, Zeb and Boyd met the parties before named who had preceded them across the river. While they were chatting Harve Justice rode up on his horse, and either the horse stepped on Mary's foot or Harve cut her foot with his spur while dismounting. The deceased then wanted to use the horse to take his sister to a doctor to have her injured foot examined and treated, and he and Mary got on the horse. Harve refused to let them have the horse, claiming that he had to return to his home in Virginia, as his wife had been ill, but did offer to try to secure for them another means of conveyance. Why the sudden concern for his wife, in the face of the fact that he had been at the accused's home since the evening before, is not explained. Thereupon, according to the defense witnesses, the deceasd struck Harve on the head with a half-gallon fruit jar about half full of liquor, knocking him over the bank, and when

Harve attempted to climb up the bank, the deceased kicked him back down; Mary commenced yelling to the defendant "to come over and part them." Thereupon the accused, who stated that he was shaving and dressing preparatory to making a trip to Devon upon the return of his wife, according to the testimony of Mrs. Joe Daniels, seized a revolver that was lying on a dresser in his room, rushed out of the house, mounted his saddle mule and galloped across the river. In the meantime the deceased had left the scene of the trouble with Harve Justice and was walking down the railroad track. The accused, on reaching the opposite bank, pursued the deceased at a run, and without dismounting, pulled his revolver and fired twice, the deceased falling on the track at the first shot. Mrs. Daniels stated that she was sitting on the accused's porch at the time and in full view of the scene. However, the defense sought to show that her view was obstructed by bushes along the river bank. A dying statement of the accused made to the sheriff and other officers some six or seven hours afterward but only an hour or so before death, corroborated his wife's testimony. It was to the effect that while he was walking down the railroad track, he was overtaken by the accused on his mule, who said: "What in the hell does this mean?" and about that time he shot him. Thus, the State proceeded on the theory that the defendant took a pistol over with him and shot the deceased down. The defense is that on Mat's arrival the deceased turned and struck him with an iron bar, knocking him from his mule, and then tried to pull a gun, and that in the tussle which followed over the gun, the deceased shot himself. The defendant denied having a gun, and one or two other witnesses testify that they saw Joe with Zeb Justice's pistol over on the West Virginia side sometime that afternoon. The effect of the dying declaration put in evidence by the State, to which we have averted, was sought to be weakened by the introduction of contradictory statements made by the deceased to witnesses for the defense.

The defendant insists that the verdict is contrary to the law and the evidence. True, the defendant and five eye witnesses testified that the shooting occurred while the deceased

494

and the defendant were in a "tussle", and four of that number said that Joe Daniels, within a few minutes after the shooting, told them that he got in a tussle and got shot. All these witnesses had been stopping at Mat's since Saturday and were more or less interested. We must note also that when Glenn Williams asked deceased who shot him, he answered, "I will tell you after a while." Mrs. Daniels testified that late that night when he was moved down near Boyd Justice's house, he told her not to let them take him in for they would finish him. A like statement was made to the officers upon their arrival later. Daniels was not carried into the house, according to these officers, until after he died. The deceased was shot in the left side, above his belt, the bullet ranging downward, coming out on the opposite side of the body. And then, the officers testify that there were no powder burns on the clothing or the body of the deceased, and that such would have been the case had the deceased shot himself, as contended for by the defendant. The pistol must have been some distance away when fired. Also, while the defendant seeks, by Zeb Justice, and others, to show that the pistol was a .38, and that the same was thrown into the river, and later traded to someone they did not know, or know where he lived, the officers testify that the wound was caused by a larger caliber gun—a .44 or .45. Why did the defendant keep the iron bar and not the revolver claimed to have been used by the deceased, if it was material to his case? And then, why did not the deceased use a gun instead of the quart jar of moonshine when he and Harve Justice got into their fight, and later when he was supposed to have struck Mat Justice? The evidence that Mat tried to get a doctor, at its best, was not very convincing. He states that he started to ride his mule for a doctor and ran into a fence some few yards away and hurt his shoulder and foot, and that he returned and sent his brother Boyd out, and that when Boyd returned from Glen Alum without a doctor he gave him a twenty dollar bill to go to another point. A doctor never was secured. Boyd was not produced as a witness to corroborate Mat's testimony, and the latter said he did not know the whereabouts of his brother at the time of the trial. While

the only evidence of drinking was that the deceased had been drinking and that Harve had been drinking, yet the officers state that the deceased did not have the odor of liquor on his breath at the time of their arrival. Defendant was not present when the officers arrived, and on the following morning left his home, and was not apprehended for a couple of months. He states that he was afraid the Daniels boys would hurt him, and left on that account. He claims that his shoulder was injured by the blow inflicted by the deceased with the iron bar and that a certain doctor treated him. The doctor did not testify nor did it appear from the record that there had been any attempt to secure his presence as a witness at the trial. The officers testified that the accused was arrested at the home of Amanda Carter, mother of the young woman, Bessie Carter, who was at the scene of the trouble leading to the fatal shooting. According to the arresting officers, the accused and the unmarried daughter Bessie were occupying the same bed, and two .45 caliber automatic pistols were found in the bed so occupied. This occupancy of the bed by them is denied by Bessie and the accused. However, the accused does admit that he had been recently carrying the revolvers in scabbards on either side of his body, and that when the officers knocked on the door demanding admission he took the weapons out of their holsters and laid them on the bed.

Other errors relied on for reversal of the case go to the action of the trial court in admitting certain testimony on behalf of the State, and in giving certain instructions to the jury at its request.

The State was evidently surprised by the testimony of Mary Daniels, the sister of the deceased, and was permitted, over objection, to interrogate her concerning statements made on the trial which were contradictory to those made on preliminary examination. We believe this was proper, even though the State did not follow up by testimony to impeach the witness. "A party who is surprised by unfavorable testimony given by his own witness may interrogate such witness as to previous inconsistent statements made by him." *State v. Swiger*, 105 W. Va. 358.

The accused complains of the introduction of the testimony of the officers of the circumstances under which the defendant was arrested. It is elementary law that where the accused evades arrest, it is proper to show the circumstances attending it, as well as to show who was in company with accused at the time of arrest. 16 C. J. 551, 553. The questioning of certain of the witnesses, other than the defendant, tending to degrade them, clearly cannot be set up as error in this case, since they did not set up any claim of privilege. *State* v. *Hill*, 52 W. Va. 296; *State* v. *Webb*, 99 W. Va. 225. The evidence of the illicit relations of the accused with Bessie Carter was also admissible, as tending to show bias toward him in her testimony as a witness in his behalf.

The defendant, on cross-examination, on being questioned as to the reasons for his possession of the revolvers at the time of his arrest, and on his contending that they had been only acquired after the killing of Daniels, was subjected to the following inquiry: "Do you know John McCullough, a colored man that used to work for you? A. A colored man who used to work for me? A. John Henry, I mean. A. No sir, I don't. Q. You don't know him? A. I don't know no colored man who used to work for me. Q. Do you know John Henry? A. If I could see him I might know him. A. Is John Henry in the court room? Stand up John Henry. (At this point a colored man stands up in the gallery.) Q. Do you know that man with his leg off up there? A. Yes, sir, I have seen a man like that. Q. Did you shoot his leg off?" This was objected to by counsel for the defendant, which objection was sustained by the court. Counsel for the accused contends that the question was asked for the purpose of, and in fact did, prejudice the jury, and that such error was not cured by the ruling of the court thereon. The case of *State* v. *Morris & Johnson*, 96 W. Va. 291, is relied on to support this contention. In the cited case, attacks were made upon the character of the accused as a law abiding citizen (the same not being at issue) by a series of questions *persistently* propounded to him on cross-examination. This Court there held that such error was not cured by the ruling of the court sustaining objections to the questions and striking out the

answers thereto. The vice in the conduct of the attorney for the State there pointed out, however, was the *repeated* efforts made by him to place such evidence before the jury *after* the first question was ruled out as being improper by the court. There, the questions were answered and later stricken out by the court. In the instant case, we find only an isolated inquiry which the court very properly and commendably refused to be permitted to be answered by the prisoner. While the apparent aim of the prosecution was to show a prior possession of revolvers by the defendant by the question complained of, it had a tendency to prejudice the jury against the defendant, and was improper since the character of the accused becomes an issue under our law only where he voluntarily makes it so. A prosecuting officer should never lose sight of the fact that the ethics of his office enjoins upon him the duty, in cases where life and liberty are at stake, of seeing that the accused is accorded a fair and impartial trial. The prompt ruling of the court in the present instance, in our judgment, robbed the challenged action of such deleterious effect upon the prisoner's case as would make it ground for reversal.

The first of the State's instructions is to the effect that a man is presumed to intend that which he does, and if the defendant with a deadly weapon in his possession, without any or upon very slight provocation, gave the mortal wound, he is *prima facie* guilty of wilful, deliberate and premeditated killing, and the necessity rests upon him of showing extenuating circumstances, and if he does not prove such extenuating circumstances or the same do not appear from the case made by the State, he would be guilty of murder in the first degree. This is the usual instruction given in such cases, and has had the repeated sanction of this Court. This instruction was warranted under the version of the tragedy given by the wife of the victim, who was an eye witness to it, as well as under the dying declaration of the deceased. Instruction No. 2 for the State defines the verdicts that may be found under the indictment and gives the penalties that may be inflicted under each. This is also sanctioned in such cases. The only objections made to them were that the same were abstract. The four instructions asked for by the defendant

were given.. No. 1 told the jury that they were to give to the dying declaration testified by the various witnesses only such weight as they would have given the same evidence had it been given by the deceased; No. 2 that the defendant is presumed to be innocent, etc.; No. 3 that the presumption of innocence is an essential and substantial part of the law, and that full benefit must be given that presumption; and No. 4 instructs that if they believe from the evidence that the deceased started to pull a pistol from his pocket, and that the defendant grabbed his hand to prevent him from getting the pistol and a scuffle ensued, and in the scuffle the pistol was accidentally discharged and shot the deceased, from which wound he died, they must find the defendant "not guilty". This last instruction embodied the defense relied upon by the prisoner.

The theories of both the State and the defendant having been thus fairly and fully presented to the jury by the instructions given, their solemn verdict arrived at on the evidence, though conflicting, cannot be disturbed. *State* v. *Porter*, 98 W. Va. 390; *State* v. *Morgan*, 35 W. Va. 260; *State* v. *Baker*, 33 W. Va. 355; *Grayson's case*, 6 Grat. 712.

*Affirmed.*