State Of West Virginia

*v.*

Ernest Ferguson

(No. 14399)

Decided September 23, 1980.

530

*Greene, Ketchum & Mills and Larry A. Bailey, Ralph S. Dickerson,* for plaintiff-in-error.

*Chauncey H. Browning,* Attorney General, *Robert O. Ellis,* Special Assistant Attorney General, for defendant-in-error.

HARSHBARGER, JUSTICE:

In March, 1978, Ernest Ferguson was convicted by a jury in Wayne County Circuit Court, and sentenced to life imprisonment without recommendation of mercy, for murdering his wife, Leota.

The undisputed evidence was that Mrs. Ferguson died of a bullet wound suffered on July 19, 1977, at her home, and that immediately before receiving the wound she was engaged in physical struggle with her husband.

Ferguson testified that his wife, with pistol in her left hand, had threatened to kill herself, had then threat-

ened him, and that while he was trying to disarm her the pistol discharged and thus she killed herself. The government's evidence was that Mrs. Ferguson could not possibly have shot herself, and only her husband could have killed her. The state also attempted to prove he had previously maliciously threatened and abused her.

Testimony by Dr. Raul V. Pisano, a forensic pathologist who performed the post-mortem examination of Mrs. Ferguson, was that the fatal bullet entered at the rear of her right armpit, traversed the thoracic cavity and penetrated her aorta; and the pistol was positioned either at the right side or rear of her right armpit. He found no gun powder or residue either inside or outside the wound, and over objection, he gave his opinion that the absence of powder demonstrated that the pistol when fired was more than eighteen inches from her.

The government had two notes found in Mrs. Ferguson's Bible and identified by Elaine Stamper, her daughter, to be in her mother's handwriting. The first was:

> Ernest shot me Leota in the back April 29th, 77.

The second was in part:

> To whom it may concern. I don't know what time I'm going to die but the way things is it can be anytime. Ernest shot me in the back April 29-77. June the 2nd he came in beat me up and pulled the gun on me several times ... June 29th he cocked the gun between my eyes and said if I spoke he would kill me.

They were identified in the jury's presence but were not put in evidence.

Later, questioning Ferguson's son, James Madison Ferguson, the prosecutor referred to the latter note:

> James, if your mother left a note, and it indicated that she was shot on April 29, 1977, would that be the truth or a lie.

Defense counsel's objection was sustained. The prosecutor also asked:

> Do you remember of her being shot in the back on April 29, 1977?

Defense counsel did not object, and the witness answered that he knew nothing about it.

Dr. Pisano also testified that he saw two areas of scar tissue on Mrs. Ferguson's back, three to four months old, and microscopic examination revealed that they contained material he found to be consistent with gunpowder.

James Madison Ferguson had given police a statement that just before the shooting his father had gone into their home, railing at and cursing his mother, and:

> I went around back of the house and heard Dad cussing and saying, God Damn, you don't want to die? I could hear Mom grunting every time he would hit her. Then I heard the gun go off and I heard my Mommy scream, and then me and my brother run up to the bridge above the house to hide.

But when he was testifying for the government he was asked about the statement and said:

> I lied about all that. At the time I thought my Dad did shoot my mother, but that's just what people told. I lied about everything I said on that.

The state then asked that he be declared a hostile witness, the court agreed, and questioning disclosed to the jury the contents of his prior statement.

The prosecutor, in closing, picked up the pistol that had been introduced into evidence and said:

> I ask you to take this gun to the jury room with you, and if you can get into a position with this gun like this, or even like this, and remember they testified that she was holding it in this fashion, and bring it around and shoot yourself

with it and not leave powder burns on your hands, around the wound or inside the track of the burns, then I say find this man not guilty.

## I.

Was there sufficient evidence to support a murder verdict?

In *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978), Syllabus Point 1, we suggested a standard for reviewing evidence sufficiency in criminal cases:

> In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done.

We have held that this standard applies to a trial court's consideration of motions for directed verdicts, to its determination about the choices of verdicts to be presented to a jury, *Gaines v. Leverette*, ____ W.Va. ____, 266 S.E.2d 451 (1980), and in our consideration of appeals, *State v. Dobbs*, 163 W.Va. 630, 259 S.E.2d 829 (1979).

The United States Supreme Court in *Burks v. United States*, 437 U.S. 1, 16, 98 S.CT. 2141, 2150, 57 L.Ed.2d 1, 13 (1978), wrote:

> The prevailing rule has long been that a district judge is to submit a case to the jury if the evidence and inferences therefrom most favorable to the prosecution would warrant the jury finding the defendant guilty beyond a reasonable doubt. [Citations omitted.] Obviously a federal appellate court applies no higher a standard; rather, it must sustain the verdict if there is

substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision. . . .

See, State v. Frazier, 162 W.Va. 602, 252 S.E.2d 39 (1979).

A homicide maliciously committed is murder, State v. Roush, 95 W.Va. 132, 120 S.E. 304 (1923). Methods for proving malice cannot be definitely prescribed because it is a subjective attitute, State v. Gunter, 123 W.Va. 569, 17 S.E.2d 46 (1941); however, it may be inferred from the intentional use of a deadly weapon, State v. Brant, 162 W.Va. 762, 252 S.E.2d 901 (1979). Also, it may be implied from a deliberate cruel act against another because the act indicates a heart, regardless of social duty, fatally bent on mischief. See, State v. Welch, 36 W.Va. 690, 15 S.E. 419 (1892).

The difference between first and second-degree murder is whether the homicide was wilful, deliberate, and premeditated. State v. Hobbs, 37 W.Va. 812, 17 S.E. 380 (1893). Intention to kill need not exist for any particular length of time for the act to be wilful, deliberate, and premeditated; it is only necessary that the intention initially should come into existence anytime before the homicide. State v. Burdette, 135 W.Va. 312, 63 S.E.2d 69 (1951); State v. Painter, 135 W.Va. 106, 63 S.E.2d 86 (1950). Like malice, wilfulness and deliberation may be inferred when a deadly weapon is used. State v. McCauley, 130 W.Va. 401, 43 S.E.2d 454 (1947); State v. Panetta, 85 W.Va. 212, 101 S.E. 360 (1919).

There was evidence that Ferguson killed his wife with a deadly weapon, and the jury could have inferred malice. Also, "I ... heard Dad cussing and saying, God damn, you don't want to die? I could hear Mom grunting every time he would hit her . . . ."; and testimony by the pathologist that there were multiple, fresh contusions and abrasions on the victim's body, were sufficient to justify a jury finding that Ferguson brutally beat his wife, and then shot her.

The learned trial judge did not err when he denied Ferguson's motion for a directed verdict because of insufficient evidence.

## II.

These state instructions were given:

> The Court instructs the jury that to constitute a wilful, deliberate and premeditated killing constituting murder in the first degree, it is not necessary that an intention to kill should exist for any particular length of time prior to the actual killing; it is only necessary that such intention should come into existence for the first time at the time of such killing, or at any previous time thereto.

> The Court instructs the jury that one of five verdicts may be found under the indictment in this case, if the evidence in the case so warrants: (1) Guilty of murder in the first degree (2) Guilty of murder in the second degree, (3) Guilty of voluntary manslaughter, (4) Guilty of involuntary manslaughter and, (5) Not guilty.

There was no objection to these instructions, and defendant does not argue that they improperly state the law of this State; but that there was no evidence of premeditation, wilfulness, deliberation, specific intent, or malice to support them.

The proofs we have recited certainly justify a jury decision that Ferguson maliciously, wilfully, and premeditatedly shot his wife, and these instructions were supported by evidence.

## III.

Defendant asserts that the court should have granted his motion in limine[1] to suppress all evidence about the

---

[1] In our practice, a motion in limine is designed to obtain rulings on evidentiary matters, before trial, to protect juries from exposure to impermissible evidence that might ultimately be excluded from its consideration. *See,* Cleckley, *Handbook on Evidence for West Virginia Lawyers,* p. 105 (1st Ed. 1978).

two notes authored by Leota Ferguson, and about her physical abuse.

Objection to the admission of the notes was sustained and they were not put in evidence after being identified. However, their contents were revealed during James Madison Ferguson's direct questioning:

> James, if your mother left a note, and it indicated that she was shot on April 29, 1977, would that be the truth or a lie?

That question did not connect defendant with any shooting on April 29, 1977: his counsel's objection was sustained.

Other evidence of prior wounding was admitted: the statement by James Madison Ferguson that, "I could hear Mom grunting every time he would hit her"; and Dr. Pisano's testimony that there were multiple fresh contusions and abrasions on the victim's body.

Events, declarations and circumstances which are near in time, causally connected with, and illustrative of transactions being investigated are generally considered *res gestae. See, Ward v. Raleigh County Park Board*, 143 W.Va. 931, 105 S.E.2d 881 (1958); *State v. Evans*, 89 W.Va. 379, 109 S.E. 332 (1921); *State v. Prater*, 52 W.Va. 132, 43 S.E. 230 (1902). *See also, State v. Mahramus*, 157 W.Va. 175, 200 S.E.2d 357 (1973), Syllabus Point 1; *State v. Coram*, 116 W.Va. 492, 182 S.E. 83 (1935), Syllabus Point 1.

In *State v. Gunnoe*, 74 W.Va. 741, 83 S.E. 64 (1914), Syllabus Point 1, we wrote:

> In case of homicide caused, in a physical struggle, by strangulation, according to expert and uncontradicted testimony, it is competent for a physician, who at the autopsy conducted by him on the body of deceased shortly after death observed a bruise or scratch on the face of accused, then present, to express, upon the trial, the opinion that such wound was a fresh break in the

skin, had fresh blood in it, and was caused by a finger nail.

## IV.

The trial court was correct in not allowing Ferguson's lawyer to vouch the record about the qualifications of Dr. Pisano to testify that there were no powder burns on the victim's body. In *State v. Cokeley*, 159 W.Va. 664, 226 S.E.2d 40 (1976), we found error when a court refused to allow counsel to put in the record that which he proposed to prove, after an objection to evidence had been sustained.

The prosecutor asked Dr. Pisano questions to establish that he was a licensed expert in forensic pathology. He answered that he was a licensed physician and that he had been trained in pathology at Johns Hopkins University and at Sinai Hospital in Baltimore, Maryland. He was Board-certified in pathology and forensic pathology, and a member of the American Academy of Forensic Sciences and the West Virginia Association of Pathology. He served as Assistant Medical Examiner in Baltimore, Maryland and Assistant Medical Examiner for the State of West Virginia. He had performed some three thousand autopsies, of which five hundred involved gunshot wounds, and described in depth various autopsy procedures.

Ferguson did not object to Dr. Pisano's qualification.

The state asked him about powder burns on Mrs. Ferguson's body and the court permitted him to answer. Defendant's motion to strike his responses because he was not qualified to answer questions about powder burns, was denied. Then, the defense moved to voir dire Dr. Pisano about his qualifications to assess powder burns, or alternatively to vouch the record. Both motions were denied.

Ferguson's lawyer asked no questions on cross-examination about Dr. Pisano's background, education, or experience, but about shot patterns, bullets, and such.

He could have examined Dr. Pisano about his powder burn expertise but did not, and cannot now complain.

## V.

The trial judge allowed James Madison Ferguson to be treated as a hostile, unfriendly witness by the government. James had made a statement shortly after the shooting, but when called as a state witness and asked about it, said: "I lied about that."

In Syllabus Point 2 of *State v. Swiger*, 105 W.Va. 358, 143 S.E. 85 (1928), we wrote:

> A party who is surprised by unfavorable testimony given by his own witness may interrogate such witness as to previous inconsistent statements made by him.

*See, State v. Blankenship*, 137 W.Va. 1, 69 S.E.2d 398 (1952); *State v. Wolfe*, 109 W.Va. 590, 156 S.E. 56 (1930); *State v. Justice*, 107 W.Va. 490, 148 S.E. 843 (1929). It is evident that the government expected James to testify consistent with his prior statement and that his repudiation thereof was surprise. *Swiger's* rule applies.

## VI.

Was this State instruction bad:

> The Court instructs the jury that you may infer that a person intends to do that which he does, or which is the natural or necessary consequence of his own act.

We discussed language nearly identical to that used here in *State v. Wright*, 162 W.Va. 332, 249 S.E.2d 519 (1978), Syllabus Point 2:

> Insofar as the jury was permitted but not required to find from the evidence that the defendant had the intent to kill, and insofar as the jury was properly and adequately advised of the State's duty to prove intent to kill beyond a reasonable doubt, the giving of the instruction that "the jury may infer that a person intends to do that which he does, or which is the natural or

necessary consequence of his act" was not reversible error in this case.

## VII.

Defendant moved to strike from jury consideration a government suggestion in closing argument that the jury should take the murder weapon to its room and attempt to place it in a position consistent with Ferguson's explanation about how his wife was shot. The jury was allowed to take the pistol.

Syllabus Point 9 of *State v. Panetta, supra,* states:

> It is within the sound discretion of the trial court to permit weapons used in the commission of the crime and the garments worn by the deceased at the time he was killed showing marks of violence, which have been identified and given in evidence, to be carried by the jury to their room when they retire to consider of their verdict.

This is the rule in several jurisdictions: *see, Goins v. United States,* 99 F.2d 147 (4th Cir.), *cert. denied,* 306 U.S. 622, 83 L.Ed. 1027, 59 S.Ct. 783; *Higgins v. Los Angeles Gas & Electric Co.,* 159 Cal. 651, 115 P. 313 (1911); *State v. Rusow,* 106 S.W.2d 429 (Mo. 1937); *Hopkins v. State,* 9 Okla. Crim. 104, 130 P. 1101 (1913); *State v. Cushing,* 14 Wash. 527, 45 P. 145 (1896). What jurors do with such exhibits is their business and there was no error in the prosecutor's remark or the judge's ruling about it.

The judgment of the Circuit Court of Wayne County is affirmed.

*Affirmed.*