687 S.E.2d 367

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Charles M. BIEHL, Defendant Below, Appellant.**

**No. 34701.**

Supreme Court of Appeals of West Virginia.

Submitted Oct. 6, 2009.

Decided Nov. 23, 2009.

Teresa C. Monk, Esq., Fifth Judicial Circuit Public Defender Corp., Spencer, WV, for Appellant.

Darrell V. McGraw, Jr., Attorney General, Robert D. Goldberg, Esq., Assistant Attorney General, Charleston, WV, for Appellee.

PER CURIAM:

On January 17, 2008, the appellant, hereafter Mr. Biehl, was found guilty of first degree murder for the beating and strangulation death of Sharron I. Farren of Ripley, West Virginia. Mr. Biehl's jury did not recommended mercy and on February 20, 2008, the trial court sentenced Mr. Biehl to life imprisonment without the possibility of parole. This appeal followed.

For the reasons set forth herein, we affirm Mr. Biehl's conviction and sentence.

## I.

### *Background*

On January 7, 2007, the decedent was murdered in her home. The State Medical Examiner testified that the decedent died from asphyxia attributable to ligature and manual strangulation and that the force of the strangulation was such that it broke a bone above the decedent's esophagus and left indentations on her neck. The Medical Examiner further testified that the decedent was beaten in the face, fracturing her nose, and also that the decedent lived approximately two minutes during her strangulation.

In investigating the decedent's murder, law enforcement investigators learned that Mr. Biehl, who was homeless and unemployed, had been living in a guest room at the decedent's residence at the decedent's invitation. Investigators also learned from several witnesses that Mr. Biehl had been seen at the decedent's residence on the day and evening of the murder. However, following discovery of the decedent's body the morning after her death, Mr. Biehl could not be located. Deeming Mr. Biehl to be a person of interest, law enforcement authorities

issued a bulletin requesting that Mr. Biehl be picked up for questioning.

In the ensuing investigation, investigators learned that shortly prior to the decedent's death Mr. Biehl had been in an argument with the decedent over Mr. Biehl's drinking beer, and at one point Mr. Biehl had "jumped up" at the decedent and "got real mean at her." Investigator's also learned that Mr. Biehl made several calls from the decedent's telephone. These included calls to Mr. Biehl's mother and to an aunt of Mr. Biehl's who lived in Florida. Investigator's also learned that later in the evening of the decedent's death, Mr. Biehl was seen at a convenience store located approximately 1 mile outside of Ripley, WV, where Mr. Biehl asked employees of the store for directions. Trial testimony established that Mr. Biehl was planning to hitchhike to Florida.

On January 10, 2007, Mr. Biehl was located at the Union Mission Shelter in Charleston, West Virginia, and taken to the Kanawha County Sheriff's Department where Mr. Biehl was *Mirandized*. After agreeing to talk with investigators, Mr. Biehl gave a lengthy rambling statement. In this statement, Mr. Biehl admitted that he had lived at the decedent's residence. However, Mr. Biehl initially claimed that the decedent had thrown him out of the house on New Year's Day. Mr. Biehl subsequently amended that statement to say that he had lived in the decedent's residence for four or five days, and that he left of his own accord.

Mr. Biehl also repeatedly denied being in the decedent's residence on the day of her murder and it was only when confronted with evidence of the calls he had made from the decedent's residence on the day of the decedent's death that Mr. Biehl admitted to being there that day. However, Mr. Biehl at this point attempted to implicate others in the decedent's death.

When Mr. Biehl was asked whether he had struck the decedent, Mr. Biehl repeatedly denied that he had, stating that the decedent was in good health when he left her residence. When asked about a cut on Mr. Biehl's knuckle, Mr. Biehl initially stated that he had cut it on a door handle. Mr. Biehl subsequently amended that statement and said that he had been arguing with the decedent and cut his knuckle when he hit a door jam. After further questioning, Mr. Biehl admitted that he had hit the decedent in her nose.

Mr. Biehl was subsequently arrested and charged with the decedent's murder. Following a jury trial, Mr. Biehl was found guilty of first degree murder and the jury did not make a recommendation of mercy.

## II.

### *Standard of Review*

On appeal, Mr. Biehl presents three assignments of error. First, that the evidence submitted at trial was insufficient to sustain a conviction for first degree murder, and therefore the trial court erred in not granting a judgment of acquittal following close of the state's case-in-chief. Second, that the trial court erred in admitting evidence that Mr. Biehl struck the decedent in the face shortly before prior to the decedent's death. Third, that the trial court erred in not submitting to the jury the lessor included offenses of battery, unlawful assault and malicious assault. For purposes of clarity, we set forth our standard of review at the beginning of our discussion for each of these assigned errors.

## III.

### *Discussion*

### A. Sufficiency of the Evidence

We have previously held that "[a] reviewing court should not reverse a criminal case on the facts which have been passed upon by the jury, unless the court can say that there is reasonable doubt of guilt and that the verdict must have been the result of misapprehension, or passion and prejudice." Syllabus Point 3, *State v. Sprigg*, 103 W.Va. 404, 137 S.E. 746 (1927). In Syllabus Point 1, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), we further held that:

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine

whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

■ With these standards in mind, we address Mr. Biehl's argument that the evidence was insufficient to sustain a conviction.

The record before us shows that several witnesses testified at Mr. Biehl's trial that Mr. Biehl had been living at the decedent's residence as a guest and had first started living there around New Year's Day 2007. The day prior to the decedent's death, Dianna Thurman, a friend of the decedent's, stayed with the decedent and Mr. Biehl. Ms. Thurman testified that while there, she witnessed Mr. Biehl and the decedent argue over beer and that Mr. Biehl at one point "jumped up" at the decedent and "got real mean at her."

Several witnesses also testified to seeing Mr. Biehl at the decedent's residence on the day of her murder. These witnesses included Marvin Brown, who testified that he was at the decedent's house for several hours with both the decedent and Mr. Biehl, but that he left and went to Charleston and that Mr. Biehl and the decedent remained at the decedent's home. Later that evening, Mr. Biehl called Mr. Brown's cell phone approximately ten to fifteen times.

Kimberly Shinn testified to seeing Mr. Biehl, on the day of the decedent's death, walk into the decedent's house around 12:30 to 1:00 carrying a case of beer. Bo Watkins, who subsequently discovered the decedent's body, testified that he saw Mr. Biehl at the decedent's home around 1:00 or 2:00 in the afternoon. Ronald Hatcher testified that he delivered a kitten to the decedent around 5:30 to 6:00 on the evening of the decedent's death, and that both the decedent and Mr. Biehl were present at that time. Approximately one hour later, at 7:00 to 7:10 p.m., a local police officer testified that he saw Mr. Biehl walking across a church parking lot, which was located approximately 3/4 of a mile from the decedent's residence.

In contrast to the testimony clearly placing Mr. Biehl at the decedent's residence on the day of her death, evidence introduced at Mr. Biehl's trial also included Mr. Biehl's statement. In this statement, summarized *supra,* Mr. Biehl initially repeatedly denied being at the decedent's residence on the day of her murder, only to subsequently admit to being at the decedent's home when confronted with evidence proving that he was there. Mr. Biehl's statement also included repeated denials to having struck the decedent in the face, only to subsequently admit to having hit her in the nose.

Evidence at Mr. Biehl's trial also established that the decedent was found bent over lying on her face and that she had been, in addition to being strangled to death with a telephone cord, beaten in the face breaking her nose. The jury also heard evidence that around the time of the decedent's death, Mr. Biehl was seen approximately 3/4 of a mile from the decedent's residence, and that Mr. Biehl that he had made calls to an Aunt in Florida and further that Mr. Biehl had asked at least two people for directions.

Notwithstanding this evidence, Mr. Biehl argues that the State failed to submit sufficient evidence to prove that he had murdered the decedent. In support of this argument, Mr. Biehl points to DNA evidence recovered from the telephone cord, which included the decedent's DNA and the DNA of an unknown person. Mr. Biehl argues that the absence of his DNA on the telephone cord establishes that he was not the murderer and that the state failed to prove otherwise.

■ Having fully considered Mr. Biehl's arguments, we find that the State submitted sufficient evidence whereby a jury could have found that Mr. Biehl murdered the decedent. While the evidence is largely circumstantial, we have repeatedly held that "[t]he weight of circumstantial evidence, as in the case of direct evidence, is a question for jury determination, and whether such evidence excludes, to a moral certainty, every reasonable hypothesis, other than that of guilt, is a question for the jury." Syllabus Point 4, *State v. Bailey,* 151 W.Va. 796, 155 S.E.2d

850 (1967). In the present case, the evidence supports the jury's findings. Mr. Biehl's repeated denials to being present at the decedent's home on the day of her death were clearly false, a point ultimately conceded by Mr. Biehl in his statement. These false statements were fairly considered by the jury. Similarly, and perhaps the most crucial piece of evidence against Mr. Biehl is the fact that the Medical Examiner established that the decedent had a bloodied broken nose at the time of her death.

The jury heard of Mr. Biehl's repeated denials to having struck the decedent in the face, and of Mr. Biehl's ultimately admitting to hitting the decedent in the nose. When considered with the evidence that the decedent had a bloodied, broken nose at the time of her death, and that the decedent was shortly afterwards seen leaving the decedent's residence asking for directions, the jury could properly infer that the decedent's violent death was at the hands of Mr. Biehl. The fact that Mr. Biehl's DNA was not on the telephone cord is not proof that he was not the murderer under the facts of this case.

### B. Evidence that Mr. Biehl Struck the Decedent

■ Mr. Biehl argues that he trial court erred in admitting evidence that Mr. Biehl had struck the decedent in the nose without conducting a proper *Rule* 404(b) hearing under our decision in *State v. McGinnis,* 193 W.Va. 147, 455 S.E.2d 516 (1994). In response, the State argues that it did not offer evidence that Mr. Biehl had stuck the decedent in the nose as prior bad act evidence, but rather *res gestae* evidence offered as part and parcel of the proof charged in the indictment.

■ We have previously held that "[r]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion[.]" Syllabus Point 2, *State v. Peyatt,* 173 W.Va. 317, 315 S.E.2d 574 (1983). With this standard in mind, we turn to the issues raised in this assigned error.

■ Under our jurisprudence, there is a clear distinction between evidence offered as *res jestae* of the offense charged and *Rule* 404(b) evidence. This distinction is between evidence categorized as *intrinsic* in nature and *extrinsic* in nature. In Syllabus Point 3, *State v. Ferguson,* 165 W.Va. 529, 270 S.E.2d 166 (1980), overruled on other grounds by *State v. Kopa,* 173 W.Va. 43, 311 S.E.2d 412 (1983), we held that "[e]vents, declarations and circumstances which are near in time, causally connected with, and illustrative of transactions being investigated are generally considered *res gestae* and admissible at trial." *See also State v. Dennis,* 216 W.Va. 331, 351–352, 607 S.E.2d 437, 457–458 (2004), *citing United States v. Williams,* 900 F.2d 823, 825 (5th Cir.1990) (" 'Other act' evidence is 'intrinsic' when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged").

■ This is not to say, however, that prosecutors have free reign to introduce evidence of other crimes under the guise that it is *res gestae.* Instead, we have held that "[o]ther criminal act evidence admissible as part of the *res gestae* or same transaction introduced for the purpose of explaining the crime charged must be confined to that which is reasonably necessary to accomplish such purpose." Syllabus Point 1, *State v. Spicer,* 162 W.Va. 127, 245 S.E.2d 922 (1978).

Mr. Biehl argues that evidence pertinent to the fact that he had stuck the decedent in the nose with his fist prior to her death was extrinsic in nature, constituting evidence of other bad acts governed by *Rule 404(b)* of our Rules of Evidence. We disagree. The evidence clearly established that at approximately 6:00 p.m., the decedent was seen—for the last time before her death—by a witness and no testimony was offered to establish that the decedent had a bloodied broken nose at that time. Approximately one hour later, Mr. Biehl is seen approximately 3/4 of a mile away from the decedent's residence and further evidence established that a short time later he was outside of town asking for directions. The evidence clearly established that Mr. Biehl did, in fact, punch the decedent in the nose, and that the decedent at the

time of her death had a bloodied and broken nose. Under these circumstances evidence of Mr. Biehl's striking the decedent in the nose was not extrinsic to the crime charged—first degree murder—but intrinsic evidence proving essential element[s] of the offense, including malice.[1]

Accordingly, we find no error in the trial court's admission of evidence that Mr. Biehl punched the decedent in the nose with his first shortly prior to her death.

### C. Lessor Included Offenses

Mr. Biehl argues as his final assignment of error that the trial court erred in refusing to instruct the jury on the offenses of battery, unlawful assault and malicious assault. The state argues in response that the trial court did not commit error in refusing Mr. Biehl's requested instructions, noting that Mr. Biehl concedes that the decedent did not die as a result of Mr. Biehl's punching her in the nose, but rather that the cause of death was asphyxiation by strangulation.

■ We have previously held that "[a]s a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is *de novo.*" Syllabus Point 1, *State v. Hinkle,* 200 W.Va. 280, 489 S.E.2d 257 (1996). In Syllabus Point 4, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995), we further held that:

> A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not misled by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurate-

ly reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

With these standards in mind, we turn to the issue raised.

■ The record shows that the trial court instructed the jury on the elements of first degree murder, and the lessor offenses of second degree murder and voluntary manslaughter. In refusing to give Mr. Biehl's requested instructions, the trial court reasoned that Mr. Biehl had not introduced any evidence to dispute that the decedent died by asphyxiation, and there was no dispute by Mr. Biehl that Mr. Biehl's punching the decedent in the nose, breaking it, did not cause the decedent's death.

We have previously held, in addressing instructions for lessor included offenses in murder trials, that:

> Upon an indictment for murder, in the form prescribed by ... the Code ..., which does not therein also aver facts constituting an assault or assault and battery, it is error in an instruction defining the offenses of which the accused may be found guilty under the indictment, to tell them, if not finding him guilty of the graver offenses covered by the indictment, they may find him guilty of assault and battery.

*State v. Lutz,* 85 W.Va. 330, 101 S.E. 434 (1919).

■ In Syllabus Point 2, *State v. Neider,* 170 W.Va. 662, 295 S.E.2d 902 (1982), we further held that "[w]here there is no evidentiary dispute or insufficiency on the elements of the greater offense which are different from the elements of the lesser included offense, then the defendant is not entitled to a lesser included offense instruction." In *State v. Neal,* 179 W.Va. 705, 711,

---

1. One the element of malice, the Medical Examiner also testified that the decedent was not only strangled by a telephone cord, but by manual strangulation—hands around her throat with such force as to break a bone in the decedent's throat. This evidence, when considered with the evidence that the decedent was beaten in the face with such force as to break her nose, is evidence that the decedent died a particularly brutal, painful, death and is competent evidence on the issue of malice.

371 S.E.2d 633, 639 (1988), we further noted that:

> The statutory indictment for murder does not require the State to aver the manner in which the offense was committed. Code, 61–2–1 [1931]. As noted in *Watson* [99 W.Va. 34, 127 S.E. 637 (1925) ], *State v. Lutz,* 85 W.Va. 330, 101 S.E. 434 (1919) and *Holland v. Coiner,* 293 F.Supp. 203 (N.D.W.Va.1968), when the State avers facts concerning the commission of murder, the indictment may enable the accused to receive a lesser included offense instruction based on the additional facts contained in the indictment. None of these cases suggest that the additional averment concerning the manner in which the murder was committed constitutes a separate offense.

Having fully considered the record before us, we find no error in the trial court's refusing Mr. Biehl's requested instructions. The indictment in this case followed the statutory language, averring that Mr. Biehl "on a day in January 2007, in Jackson County, West Virginia, did feloniously, willfully, maliciously, slay, kill, and murder Sharon I. Farren, in violation of the West Virginia Code 63–1–3–1 against the peace and dignity of the state." There are no averment of facts in the indictment that would entitle Mr. Biehl to the requested instructions. Further, Mr. Biehl did not contest that the decedent was murdered by asphyxiation, but rather contested only that he was the murderer. This is the fact scenario that our holding in Syllabus Point 2, *State v. Neider, supra,* addresses.

### IV.

#### *Conclusion*

For the reasons set forth herein, the judgment of the Circuit Court of Jackson County is affirmed.

*Affirmed.*